# EXHIBIT A

# HOUSTON CASUALTY COMPANY
## Houston, Texas

## BLENDED EXECUTIVE RISK INSURANCE POLICY
## DECLARATIONS

Policy Number:   24-MG-08-A9495                    Renewal of Policy Number:    N/A

**ITEM A.** **PARENT COMPANY:**    The PNC Financial Services Group, Inc.
Address:    One PNC Plaza
249 Fifth Avenue
Pittsburgh, PA  15222

**ITEM B.** **POLICY PERIOD**
Inception Date:    12/31/2008
Expiration Date:    12/31/2009
12:01 a.m. prevailing time at the address stated in ITEM A

**ITEM C.** **LIMIT OF LIABILITY**:    $25,000,000 in the aggregate for the **Policy Period** (including **Claims Expenses**) for all Coverage Sections combined.

Coverage Section A.    Company Liability (D&O)
Coverage Section B.    Financial Institution Professional Liability
Coverage Section C.    Employment Practices Liability
Coverage Section D.    Financial Institution Bond

**ITEM D.** **RETENTION:**    $25,000,000 per **Claim** or **Loss**, Coverage Sections A, B and C, or as endorsed
(For Coverage Section D, see Bond Table for deductible amounts)

**ITEM E.** **DISCOVERY PERIOD**
Duration:    One (1) year
Additional Premium:    150% (based on the policy premium identified in ITEM F)

**ITEM F.** **POLICY PREMIUM:**    $3,850,000   Such premium to be deemed fully earned at inception of the **Policy Period** subject to cancellation of the Policy by mutual consent.

**ITEM G.** **NOTICES TO THE INSUREDS SHALL BE ADDRESSED TO:**
Mr. Richard Spickard
Insurance Risk Management Department
The PNC Financial Services Group, Inc.
at the address stated in ITEM A

**ITEM H.** **NOTICES TO THE UNDERWRITER SHALL BE ADDRESSED TO:**
HCC GLOBAL FINANCIAL PRODUCTS LLC
P.O. Box 4018
Farmington, CT  06034

In witness whereof, the **Underwriter** has caused this Policy to be signed on this Declarations Page by its President, a Secretary and a duly authorized representative of the **Underwriter**.

Secretary          President          Authorized Representative

Date:  6/11/09

RECEIVED
JUN 1 2 2009
MARSH USA INC - FINPRO
PITTSBURGH PA

The PNC Financial Services Group, Inc.
HC 8301 (12/2008)
Page 1 of 1

# HOUSTON CASUALTY COMPANY

# BLENDED EXECUTIVE RISK INSURANCE POLICY



**HCC Global Financial Products**

8 Forest Park Drive
P.O. Box 4018
Farmington, CT 06034

## HOUSTON CASUALTY COMPANY

## BLENDED EXECUTIVE RISK INSURANCE POLICY

## GENERAL TERMS AND CONDITIONS

The following General Terms and Conditions govern all Coverage Sections of this Policy. If a General Term or Condition conflicts with any term or condition of a Coverage Section, then the term or condition of such Coverage Section shall prevail with respect to coverage under such Coverage Section.

1.  **TERRITORY**

    This Policy extends to **Claims** made or **Loss** incurred anywhere in the world.

2.  **PREMIUM**

    The premium for this Policy shall be the amount shown in ITEM F of the Declarations, together with any additional premium paid during the **Policy Period**. The premium shown on the Declarations shall be fully earned at the Inception Date of the Policy unless cancellation of the Policy is granted by mutual consent of the **Parent Company** and the **Underwriter**.

3.  **LIMIT OF LIABILITY AND RETENTION**

    The **Underwriter's** aggregate Limit of Liability for all **Loss** and **Damages** (including **Claims Expenses**) and any other amounts under this Policy shall be the amount shown in ITEM C of the Declarations, regardless of the number of Coverage Sections, Insuring Agreements, **Insureds**, **Claims**, or any other circumstances.

    The retention applicable to each **Claim** or **Loss** shall be the amount stated in ITEM D of the Declarations or as endorsed (See Bond Table for deductibles applicable to Coverage Section D). Any payments received by an **Insured** from other insurance scheduled as underlying insurance for this Policy (if any), as indicated on the schedule on file with the **Underwriter**, shall be applied to any applicable retention hereunder.

    Any interrelated **Claims** or **Losses** covered under one or more Coverage Sections of this Policy shall be subject to only one retention amount as stated in the Declarations or any applicable endorsement.

4.  **DISCOVERY PERIOD**

    If the **Underwriter** or the **Insured** fails or refuses to renew this Policy or if the Policy is terminated for any reason, any **Insured** shall have the right, upon payment of the additional premium set forth in ITEM E of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in ITEM E of the Declarations following the effective date of such cancellation, non-renewal or termination (the "**Discovery Period**"), but only with respect to any **Wrongful Acts** taking place before the date of such cancellation, non-renewal or termination. A written request for this extension, together with payment of the additional premium set forth in ITEM E of the Declarations, must be made within 60 days after the effective date of cancellation, non-renewal or termination. Such additional premium shall be deemed fully earned as of such date.

    Any **Claim(s)** made during the **Discovery Period** shall be deemed to have been made during the immediately preceding **Policy Period**. The purchase of the **Discovery Period** shall not in any way increase the Limit of Liability set forth in ITEM C of the Declarations.

5.  **CHANGES IN EXPOSURE**

    (A) Acquisition or Creation of Organizations

    If, during the **Policy Period**: (i) an organization or entity becomes a **Subsidiary**, or (ii) the **Company** acquires any organization or entity by merger into or consolidation with the **Company**, then coverage shall apply to such organization or entity and the **Insureds** of such organization or

entity, but only with respect to **Wrongful Act(s)** committed, attempted, or allegedly committed or attempted, at the time of or after such event, unless the **Underwriter** agrees, after presentation of all appropriate information, to provide coverage by endorsement for **Wrongful Act(s)** by such **Insureds** prior to such event.

If the assets of any such organization or entity (exclusive of any assets previously held directly or indirectly by any **Company**) exceed 25% of the total consolidated assets of the **Parent Company** (as reflected in the **Parent Company's** most recent quarterly consolidated financial statements), the **Parent Company** shall give written notice to the **Underwriter** of such event as soon as practicable but in no event more than 120 days after the effective date of such event, together with such information as the **Underwriter** may reasonably require, and shall pay any reasonable additional premium required by the **Underwriter**. If such notice is not provided, no coverage shall be available for such organization or entity or the **Insureds** thereof. However, this Section 5(A) shall not require such notification and payment of additional premium in connection with any internal restructuring or realignment involving one or more **Companies** and shall not limit any coverage that would otherwise be available to an **Insured** in the absence of such event.

(B)    Acquisition of **Parent Company**

If, during the **Policy Period**: (i) the **Parent Company** merges into or consolidates with another entity such that the **Parent Company** is not the surviving entity or organization and such that those who were shareholders of the **Parent Company** immediately before the merger or consolidation no longer hold at least 50% of the shares of the surviving entity or organization immediately after the merger or consolidation, or (ii) another organization, entity or person or group of organizations, entities and/or persons acting in concert (other than the **Parent Company**, a **Subsidiary** or an employee benefit plan) acquires securities or voting rights which result in ownership or voting control by the other organization, entity or person, or group of organizations, entities or persons, of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Parent Company**, then coverage under this Policy shall continue until the later of:

(1)    the Expiration Date of this Policy, or

(2)    any subsequent date to which the **Underwriter** may agree by endorsement,

but only with respect to **Wrongful Act(s)** committed, attempted, or allegedly committed or attempted, prior to or at the time of such event. Any extension pursuant to (2) above shall be conditioned upon payment of any reasonable additional premium required by the **Underwriter**. Any **Claim** or **Loss** made during such coverage extension shall be deemed to have been made during the **Policy Period** in which such event occurred. The **Parent Company** shall give written notice to the **Underwriter** of such event as soon as practicable, together with such information as the **Un derwriter** may reasonably require. However, this Section 5(B) shall not require such notification and payment of additional premium in connection with any internal restructuring or realignment involving one or more **Companies** and shall not limit any coverage that would otherwise be available to an **Insured** in the absence of such event.

(C)    Cessation of **Subsidiaries**

If, before or during the **Policy Period**, an organization or entity ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this Policy, but only with respect to **Wrongful Act(s)** committed, attempted, or allegedly committed or attempted, prior to or at the time such organization or entity ceased to be a **Subsidiary**. However, this Section 5(C) shall not limit coverage in connection with any internal restructuring or realignment involving one or more **Subsidiaries** or limit any coverage that would otherwise be available to an **Insured** in the absence of such event.

## 6.    CANCELLATION

The **Parent Company** may not cancel or terminate this Policy at any time except by mutual agreement with the **Underwriter**. The **Underwriter** may not cancel or terminate this Policy at any time except by mutual agreement with the **Parent Company** or except for non-payment of premium, in which case 20 days advance notice of cancellation shall be given. The mailing of notice as aforesaid shall be sufficient proof of the intent to cancel. The date and hour of cancellation specified in such notice shall represent the time of termination of this Policy. Delivery of such notice shall be equivalent to mailing.

If the **Parent Company** cancels or terminates this Policy with the concurrence of the **Underwriter**, or if the **Underwriter** cancels this Policy with the concurrence of the **Parent Company**, the earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable thereafter, but payment or tender of unearned premium or the return of this Policy shall not be a condition of cancellation.

Notwithstanding the foregoing, the **Parent Company** has the right to cancel if the **Underwriter's** rating falls below Moody's A3, S&P A-, Fitch A-, or A.M. Best A, and in such event the earned premium shall be computed pro rata.

7.    **SUBROGATION**

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all rights of recovery thereof, and the **Company** shall execute all papers required and shall take reasonable steps necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Underwriter** effectively to bring suit in the name of the **Company**. However, the **Underwriter** shall not be subrogated to claims against any **Insured** and shall not assert any claims in its capacity as subrogee against any **Insured** unless the **Parent Company** in its sole discretion agrees that the **Underwriter** is subrogated to such claim against an **Insured** and may assert such claim against an **Insured**. The obligations of the **Company** pursuant to this condition survive the expiration of the **Policy Period**.

8.    **COMPANY AUTHORIZATION**

By acceptance of this Policy, all **Insureds** agree that the **Parent Company** named in ITEM A of the Declarations may act on behalf of all **Insureds** with respect to the giving and receiving of notice of **Claims** or **Loss**, cancellation, payment of premiums, receiving of any return premium, the negotiation, agreement to and acceptance of any endorsements to this Policy, and the exercising of the **Discovery Period** option.

9.    **OTHER INSURANCE**

If any **Claim** or **Loss** is insured under any other valid and collectible insurance, then this Policy shall cover such **Claim** or **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Claim** or **Loss** is in excess of the amount of payment from such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written as excess insurance, in which case this Policy shall be primary insurance; Coverage Section A, Company Liability (D&O), and Coverage Section C, Employment Practices Liability, shall apply specifically excess of any valid and collectible indemnity or insurance provided by the **Non-Profit Entity** or **Other Entity**. However, except as stated in the foregoing sentence with respect to **Outside Positions**, Coverage Section C, Employment Practices Liability, is intended to provide primary insurance, and Coverage Section B, Financial Institution Professional Liability, is intended to provide primary insurance as respects **Sponsored Plan Services**.

10.    **ALTERATION, ASSIGNMENT AND TITLES LIMITATION**

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by written endorsement signed by an authorized representative of the **Underwriter**.

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

11.    **ACTION AGAINST UNDERWRITER**

No action shall be taken against the **Underwriter** unless there shall have been reasonable compliance with all of the terms of this Policy.

No person or organization shall have the right under this Policy to join the **Underwriter** as a party to any action against the **Insureds** to determine the **Insureds'** liability, nor shall the **Underwriter** be impleaded by the **Insureds** or their legal representative. Bankruptcy or insolvency of an **Insured** or of an **Insured's** estate shall not relieve the **Underwriter** of any of its obligations hereunder.

12.    **ASSIGNMENT**

No assignment or transfer of any **Insured's** rights under this Policy shall bind the **Underwriter** without the **Underwriter's** consent, which consent shall not be unreasonably withheld. If any **Insured** shall die or be adjudged incompetent, this Policy shall cover the **Insured's** legal representative as an **Insured** with respect to the coverage afforded under this Policy.

13.    **SETTLEMENT**

The **Insured** agrees not to settle any **Claim** or **Loss**, incur any **Claim Expense** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** or **Loss** in excess of the applicable retention amount without the **Underwriter's** written consent, which shall not be unreasonably withheld. The **Underwriter** shall not be liable for any such settlement, **Claim Expense**, assumed obligation or admission to which it has not consented, which consent shall not be unreasonably withheld. The **Underwriter** shall be entitled to effectively associate in the defense and negotiation of any settlement of any **Claim** or **Loss** that appears reasonably likely to involve the **Underwriter**.

14.    **REPORTING AND NOTICE**

(A)    If any **Claim** is made against an **Insured**, and the **Loss** from such **Claim** appears reasonably likely to exceed 25% of the applicable retention or the **Claim** is a class action complaint, such **Insured** must give the **Underwriter** written notice of such **Claim** as soon as practicable after the Corporate Insurance Manager or General Counsel of the **Parent Company** becomes aware of such **Claim**, but in no event later than 90 days after the end of the **Policy Period** or, if applicable, the **Discovery Period**. Such written notice must contain details of the **Claim** or **Loss**, including but not limited to the date the **Claim** was first made, where such **Claim** was made, the circumstances giving rise to such **Claim** or **Loss**, the identity of all claimants and a description of the nature and scope of the alleged damages, to the extent such information is known by the Corporate Insurance Manager or General Counsel of the **Parent Company**. As soon as practicable after receipt thereof, the **Insureds** must forward to the **Underwriter** a copy of every demand, notice, summons or other process received by them (or their representative) which appears reasonably likely to exceed the applicable retention or which relates to any class action complaint.

(B)    Notice of Potential **Claims**

If during the **Policy Period** or, if applicable, the **Discovery Period**, an **Insured** shall become aware of circumstances that could give rise to a **Claim** and, as soon as practicable after the Corporate Insurance Manager or General Counsel of the **Parent Company** becomes aware of such circumstances, but in no event later than 90 days after the end of the **Policy Period** or, if applicable, the **Discovery Period**, gives the **Underwriter** written notice describing:

(1)    the act, error or omission in question and the identity of all persons involved in such act, error or omission;

(2)    the injury or damage which has resulted or which may result therefrom;

(3)    the identity of the potential claimants; and

(4)    the circumstances by which the **Insured** became aware thereof;

to the extent such information is known by the Corporate Insurance Manager or General Counsel of the **Parent Company**, then any **Claim** subsequently made which arises therefrom shall be deemed to have been made during the **Policy Period**.

15.    **COOPERATION AND ASSISTANCE OF THE INSURED**

The **Insured** shall cooperate with and assist the **Underwriter** and its representatives with respect to the investigation or settlement of any **Claim**, **Loss** or suit, or upon notification, of any potential **Claim** or **Loss**.

However, in no event shall the **Insured** be reimbursed for loss of earnings or fees, or for internal expenses or costs incurred in cooperating with or assisting the **Underwriter** (unless specifically stated otherwise) in investigating or settling any **Claim** or **Loss** at the direction of the **Underwriter** or in the **Insured's** defense of any **Claim**, nor shall any such loss of earnings or fees or such expenses or costs apply to the retention.

16. **ADMISSION OF LIABILITY**

The **Insured** shall not, without the prior written consent of the **Underwriter**, which consent shall not be unreasonably withheld, incur any expenses, including but not limited to forgiving or reducing any compensation due or alleged to be due, or make any other payment, assume any obligation, or in any way admit or acknowledge liability in connection with any **Claim** or **Loss** in excess of the applicable retention amount or potential **Claim** or **Loss** likely to involve the **Underwriter**.

17. **CONFORMITY**

Any terms or conditions of this Policy which are in conflict with any applicable statutes of the State under whose laws the terms or conditions of this Policy are construed are hereby amended to conform to such statutes. Should any such statute make any portion of this Policy void, the voided portion shall be considered severed from this Policy and all other portions shall remain in full force and effect.

18. **ENTIRE AGREEMENT**

By acceptance of this Policy, the **Insureds** and the **Underwriter** agree that this Policy (including the written underwriting submission) and any written endorsements attached hereto constitute the entire agreement existing between them.

19. **EXHAUSTION**

If the Limit of Liability set forth in ITEM C of the Declarations is exhausted by payments under this Policy, the premium set forth in ITEM F of the Declarations shall be fully earned, all obligations of the **Underwriter** under this Policy shall be completely fulfilled and exhausted, and the **Underwriter** shall have no further obligations of any kind whatsoever under this Policy.

20. **PRESUMPTIVE INDEMNIFICATION**

The certificate of incorporation, charter, articles of association or other organizational documents of any **Insured** that is organized as a Corporation, Limited Liability Company, Limited Partnership, Investment Company or Trust, including bylaws and resolutions, shall be deemed to provide indemnification to the natural person **Insureds** to the fullest extent permitted by law.

21. **RESCISSION**

The **Underwriter** shall not be entitled under any circumstances to rescind this Policy, in whole or in part, other than for non-payment of premium.

In witness whereof, the **Underwriter** has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the **Underwriter**.

Secretary                    President

# HOUSTON CASUALTY COMPANY

# BLENDED EXECUTIVE RISK INSURANCE POLICY

## COVERAGE SECTION A. COMPANY LIABILITY (D&O)

**NOTICE: THIS IS A CLAIMS-MADE AND REPORTED COVERAGE SECTION. EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, COVERAGE HEREUNDER IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE WHILE THIS COVERAGE SECTION IS IN FORCE AND REPORTED TO THE UNDERWRITER NO LATER THAN 90 DAYS AFTER THE TERMINATION DATE OF THE POLICY PERIOD, OR, IF APPLICABLE, THE DISCOVERY PERIOD. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS, INCLUDING JUDGMENT OR SETTLEMENT AMOUNTS, SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES. AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE APPLICABLE RETENTION.**

**THIS COVERAGE SECTION DOES NOT PROVIDE FOR ANY DUTY OR OBLIGATION ON THE PART OF THE UNDERWRITER TO DEFEND ANY DIRECTORS OR OFFICERS OR THE COMPANY.**

In consideration of the payment of the premium, and in reliance upon statements contained in the written underwriting submission for coverages submitted by the **Parent Company** for this Coverage Section and subject to all terms and conditions of this Coverage Section, the **Underwriter** and the **Insureds** agree as follows:

1. **INSURING AGREEMENT**

    The **Underwriter** will pay on behalf of the **Company** all **Loss** for which the **Company** has, to the extent permitted or required by law, indemnified the **Directors and Officers** as a result of a **Claim** first made against them during the **Policy Period** or, if applicable, the **Discovery Period**, for a **Wrongful Act** which takes place during or prior to the **Policy Period**; provided, however, the **Insureds** shall report such **Claim** to the **Underwriter** as soon as practicable, but in no event later than 90 days after termination of the **Policy Period** or, if applicable, the **Discovery Period**.

2. **CLAIMS EXPENSES, SETTLEMENTS AND COOPERATION**

    (A)    The **Underwriter** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Coverage Section where the **Loss** from such **Claim** appears reasonably likely to exceed the applicable retention amount. The **Underwriter** may make any investigation it deems appropriate. However, it shall be the right and duty of the **Insureds**, not the **Underwriter**, to defend any **Claim**.

    (B)    The **Underwriter** shall advance **Claims Expenses** on a current basis. As a condition of the advancement of **Claims Expenses**, the **Underwriter** may require a written undertaking from the **Company**, in a form satisfactory to the **Underwriter**, which will guarantee the repayment of any **Claims Expenses** paid to or on behalf of the **Company** if it is finally determined that the **Claims Expenses** incurred are not covered under this Policy.

    (C)    The **Insureds** shall give the **Underwriter** all information and cooperation as the **Underwriter** may reasonably require and shall take reasonable steps to avoid prejudicing the **Underwriter's** position or its rights of recovery.

3.    **DEFINITIONS**

(A)    **Claim**, either in the singular or plural, means:

   (1)    a written demand for monetary, non-monetary or injunctive relief;

   (2)    a civil, criminal, administrative, regulatory or arbitration proceeding which is commenced by:

      (a)    service of a complaint or similar pleading;

      (b)    return of an indictment, information or similar document in the case of a criminal proceeding; or

      (c)    receipt or filing of a notice of charges;

   (3)    a civil, criminal, administrative or regulatory investigation:

      (a)    once an **Insured** is identified or notified in writing by an investigating authority that a proceeding described in Section (2) above may be commenced; or

      (b)    in the case of an investigation by any governmental or regulatory authority, including but not limited to the Securities and Exchange Commission or a similar state or foreign government authority, after the service of a subpoena, target letter, Wells Notice or similar document; and

   (4)    an extradition proceeding commenced pursuant to the United Kingdom Extradition Act 2003 or the equivalent in any jurisdiction (which shall be deemed first commenced upon receipt by an **Insured** of formal notice of an intention to bring such proceeding);

   for a **Wrongful Act**, including any appeal from the foregoing.

   The term **Claim** includes a **Securities Claim**.

(B)    **Claims Expenses** means reasonable legal fees and expenses incurred in the defense or investigation of any **Claim**, including the premium for an appeal bond, attachment bond or similar bond (but not applying for or furnishing such bond). **Claims Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees or other benefits of its directors, officers or employees.

   The term **Claims Expenses** includes **Extradition Costs**.

(C)    **Company**, either in the singular or plural, means the **Parent Company** and/or its **Subsidiaries**, including the **Parent Company** and any **Subsidiary** as a Debtor in Possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or similar provision.

(D)    **Director and/or Officer**, either in the singular or in the plural, means:

   (1)    one or more natural persons who were, now are or shall hereafter be a duly elected or appointed director, officer, principal, trustee, management committee member, member of the management board, executive committee member, or functionally similar position of the **Company**, including but not limited to a member of any committee or subcommittee of a board of the **Company** and including but not limited to such natural persons while acting as a Trustee for any of the **Company's** HR 10 (Keogh Plans) and Individual Retirement Accounts;

   (2)    one or more natural persons who have been, now are or shall hereafter be an advisory director of the **Company**;

   (3)    one or more attorneys employed by the **Company** at any time;

   (4)    with respect to a **Securities Claim** only, any other natural person or persons who were, now are or shall hereafter be employees of the **Company**;

   (5)    one or more natural persons who were, now are or shall hereafter be an employee of the **Company** and serve in an **Outside Position** with the knowledge and consent or at the request of the **Company**; and

(6)    with respect to the **Company** or any **Subsidiary** operating or incorporated in the United Kingdom or the Republic of Ireland, all employees of such **Company** or **Subsidiary** serving as shadow directors, as defined under Section 741 of the United Kingdom Companies Act 1985.

(E)    **Discovery Period** means the period set forth in ITEM E of the Declarations.

(F)    **Extradition Costs** means:

(a)    costs incurred in appealing an order for extradition pursuant to the United Kingdom Extradition Act 2003 or the equivalent in any jurisdiction, whether in the same or by way of a new proceeding; and

(b)    the reasonable premium for any appeal, bail, attachment or similar bond or financial instrument incurred by or on behalf of a **Director or Officer** by reason of a **Claim**, provided the **Underwriter** shall have no obligation to apply for or provide any collateral for any such bond or financial instrument.

(G)    **Insured(s)**, either in the singular or plural, means the **Company** and the **Directors and Officers**. However, their shall be no direct coverage under this Coverage Section for **Directors and Officers**; the coverage afforded under this Coverage Section with respect to **Directors and Officers** shall be limited to **Loss** for which the **Company** has indemnified **Directors and Officers**, as specified in Section 1 of this Coverage Section.

(H)    **Interrelated Wrongful Acts**, either in the singular or plural, means all causally connected **Wrongful Acts**.

(I)    **Loss** means the total amount which the **Directors and Officers** are legally liable to pay as result of any **Claims**, including **Claims Expenses**, damages, judgments, settlement amounts, and any award of pre- and post judgment interest, attorneys' fees and costs.  **Loss** shall not include fines, penalties and taxes, other than:

(1)    punitive, exemplary and multiplied damages; and

(2)    civil penalties assessed against a **Director or Officer** pursuant to Section 2(g)(2) of the Foreign Corrupt Practices Act of 1977 (15 U.S.C. 78dd.-2(g)(2)) and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246 (a)).

The insurability of punitive, exemplary or multiplied damages shall be governed by the law of any applicable jurisdiction which most favors coverage for such punitive, exemplary or multiple damages.

The **Underwriter** will not assert that the portion of any settlement in a **Securities Claim** arising from an initial or subsequent public offering of the **Company's** securities constitutes uninsurable loss due to alleged violations of Section 11 and/or 12 of the Securities Act of 1933, as amended (or similar laws).

(J)    **Non-Profit Entity** means any non-profit corporation, association, trust, community chest, fund, foundation or other non-profit organization or entity that is not included in the definition of **Company**.

(K)    **Other Entity** means:

(1)    any for-profit corporation, partnership, association, trust or other for-profit organization or entity that is included on the schedule that is on file with the **Underwriter**; and

(2)    any additional for-profit corporation, partnership, association, trust or other for-profit organization or entity, other than a **Publicly Traded Company**, in which a **Director or Officer** first begins service during the **Policy Period** in an **Outside Position**.

(L)    **Outside Position** means the position of director, officer, principal, trustee, management committee member, member of the management board, executive committee member, advisory director or

other functionally similar position of any **Non-Profit Entity** or **Other Entity**, including but not limited to membership on any committee or subcommittee of a board of any **Non-Profit Entity** or any **Other Entity**, if such service is at the request of, or with the knowledge and consent of, the **Company**.

(M)    **Parent Company** means the entity named as such in ITEM A of the Declarations.

(N)    **Policy Period** means the period set forth in ITEM B of the Declarations.

(O)    **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by the United States Environmental Protection Agency, or a state, country, municipality or locality counterpart thereof.  Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

(P)    **Pollution** means:

    (1)    the actual, alleged or threatened discharge, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere, or

    (2)    any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so.

(Q)    **Publicly Traded Company** means any entity which has issued securities through an offering and which securities are traded on the open market.

(R)    **Securities Claim**, either in the singular or plural, means a **Claim** which, in whole or part, is based upon, arises from, or is in consequence of:

    (1)    the purchase or sale of, or the offer or the solicitation of an offer to purchase or sell, any securities of, or issued by, the **Company**; or

    (2)    any actual or alleged violation of, breach of any obligations imposed by, or impairment of any rights under, any federal, state, local, foreign, or self-regulatory agency law or rule, including statute, rule, regulation, ordinance or common law, relating or applicable to any securities of, or issued by, the **Company**.

(S)    **Subsidiary**, either in the singular or plural, means any corporation, association, limited liability company, partnership, business trust or other organization or entity:  (1) of which the **Parent Company** directly or indirectly, including through one or more **Subsidiaries**, has or had over 50% of the voting rights representing the general right to vote for the election of directors, trustees, managing members or other governing persons or bodies of such entity or organization; (2) which is or was both not-for-profit and sponsored by a **Company**; or (3) which is listed on a schedule attached to this Policy as a **Subsidiary** and made part of the written underwriting submission or an update thereto.

(T)    **Underwriter** means Houston Casualty Company.

(U)    **Wrongful Act**, either in the singular or plural, means:

    (1)    any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted by the **Directors and Officers** in their capacity as such or in an **Outside Position**; and

    (2)    any matter claimed against the **Directors and Officers** by reason of their serving in such capacity or in an **Outside Position**.

4.    **EXCLUSIONS**

The **Underwriter** shall not be liable to make any payment for **Loss** on account of a **Claim**:

(A)    for bodily injury (other than mental anguish or emotional distress), sickness, disease or death of any person or for damage to or destruction of any tangible property including loss of use thereof;

(B)    based upon, arising out of, resulting from or in consequence of any fact, circumstance, situation, transaction or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(C)    brought or maintained by any **Director or Officer** in his or her capacity as a **Director or Officer** or brought or maintained by or on behalf of the **Company**, except:

   (1)    a **Claim** brought or maintained by any **Director or Officer** whose most recent position with the **Company**, at the time such **Claim** is brought or maintained, is or was below the position of Senior Vice President;

   (2)    a **Claim** that is a derivative action brought or maintained by or on behalf of the **Company** without the voluntary and active solicitation, assistance or participation of any **Director or Officer** whose most recent position or rank with the **Company**, at the time such **Claim** is brought or maintained, is or was at or above the position of Senior Vice President;

   (3)    a **Claim** for contribution or indemnity, if the **Claim** directly results from another **Claim** that is otherwise covered under this Coverage Section;

   (4)    a **Claim** brought or maintained by any **Director or Officer** who has not served in such a capacity for at least two years prior to such **Claim** being brought;

   (5)    in any bankruptcy or similar proceeding by or against a **Company**, a **Claim** brought by the examiner, trustee, liquidator, rehabilitator, natural person Debtor in Possession or functionally similar person or entity (or any assignee thereof) of such **Company**;

   (6)    any **Claim** brought by a **Director or Officer** of a **Company** formed and operating solely in a country other than the United States of America, Canada or any other common law country, against such **Company** or any **Director or Officer** thereof, provided that such **Claim** is brought and maintained outside the United States of America, Canada or any other common law country (including any territories thereof); or

   (7)    any **Claim** brought by an employee or a **Director or Officer** of the **Company** pursuant to any federal or state whistleblower protection statute or any rule or regulation promulgated thereunder;

(D)    for charges of seepage, **Pollution** or contamination and for any violation or alleged violation of any federal, state, municipal or other governmental statute, regulation or ordinance prohibiting or providing for the control or regulation of emissions or effluents of any kind into the atmosphere or any body of land, water, waterway or watercourse or arising from any action or proceedings brought for enforcement purposes by any public official, agency, commission or board of pollution control administration pursuant to any such statutes, regulations or ordinances or arising from any suits alleging seepage, **Pollution** or contamination based upon common law nuisance or trespass; provided, that this Exclusion (D) shall not apply with respect to a **Securities Claim** brought by a security holder of the **Company**;

(E)    for any **Wrongful Acts** of **Insureds** in their capacities as fiduciaries (including fiduciaries as defined in the Employee Retirement Income Security Act of 1974 and amendments thereto, or similar provisions of any federal, state or local statutory or common law) of any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Company**;

(F)    with respect to any **Outside Position**:

(1)  for that portion of such **Claim** that is made against the **Non-Profit Entity** or **Other Entity** or against any director, officer, trustee, governor or any other equivalent position or employee of the **Outside Entity** (but not the **Directors or Officers** serving in the **Outside Position**);

(2)  for that portion of such **Claim** that is for **Wrongful Acts** committed or attempted after the date such person(s) ceased to be a **Director or Officer** of the **Company**;

(3)  for that portion of such **Claim** that is for **Wrongful Acts** committed or attempted prior to the date such **Director or Officer** commenced serving in such **Outside Position**; or

(4)  for that portion of such **Claim** that is for **Wrongful Acts** committed or attempted after the date such **Director or Officer** ceased to serve in such **Outside Position**;

(G)  brought about or contributed to in fact by any:

(1)  deliberately dishonest, fraudulent or criminal act or omission committed by an **Insured**; or

(2)  profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

as determined by a final adjudication in the underlying action; provided, that Exclusion (G)(2) shall not apply to a **Securities Claim** arising from an initial or subsequent public offering of the **Company's** securities for violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (or similar laws);

(H)  brought or maintained by or on behalf of any **Non-Profit Entity** or **Other Entity** for **Wrongful Acts** allegedly committed or attempted by such **Director or Officer** in his or her **Outside Position** with such **Non-Profit Entity** or **Other Entity**, except:

(1)  a **Claim** that is a derivative action brought or maintained by or on behalf of the **Non-Profit Entity** or **Outside Entity** without the voluntary and active solicitation, assistance or participation of any director, officer, principal, trustee, management committee member, member of the management board, executive committee member or advisory director of such **Non-Profit Entity** or **Outside Entity**;

(2)  a **Claim** for contribution or indemnity, if the **Claim** directly results from another **Claim** that is otherwise covered under this Coverage Section; or

(3)  in bankruptcy or similar proceeding by or against a **Non-Profit Entity** or **Outside Entity**, a **Claim** brought by the examiner, trustee, liquidator, rehabilitator or functionally similar person or entity (or any assignee thereof) of such **Non-Profit Entity** or **Outside Entity**; or

(I)  based upon, arising out of, resulting from or in consequence of such **Director or Officer** acting in his or her capacity as a director or officer of any entity other than the **Company** or a **Non-Profit Entity** or **Other Entity**.

No fact, act, omission or other **Wrongful Act** pertaining to, or knowledge possessed by, any **Insured** shall be imputed to any other **Insured** for purposes of determining the application of any Exclusion.

If a **Claim** contains both matters that are covered by this Coverage Section and matters that are excluded or otherwise not covered, the **Parent Company** and the **Underwriter** shall use their best efforts to agree upon the amount of **Loss** covered by this Coverage Section.  In the event that the **Parent Company** and the **Underwriter** cannot reach such an agreement, the **Underwriter** shall advance on a current basis that portion of **Loss** which it agrees to be covered.

5.  **LIMITS OF LIABILITY AND RETENTION**

(A)  The **Underwriter's** aggregate Limit of Liability for all **Loss** under this Coverage Section shall be the amount shown in ITEM C of the Declarations, whether such **Loss** is covered under one or more Insuring Agreements (if an additional Insuring Agreement(s) is added by endorsement to this

Coverage Section).  The Limit of Liability applicable to the **Discovery Period** shall be a part of, and not in addition to, the Limit of Liability shown in ITEM C of the Declarations.

(B)     The **Underwriter's** liability for **Loss** arising from each **Claim** shall apply only to that part of **Loss** which is in excess of the retention amount set forth in ITEM D of the Declarations.

(C)     All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more of the **Insureds** shall be considered a single **Claim**.  Such **Claims** shall be deemed to be first made on the date the first such **Claim** is made or deemed to be made pursuant to Section 14 of the General Terms and Conditions, regardless of whether such date is before or during the **Policy Period**.

(D)     The Limit of Liability available to pay judgments or settlements shall be reduced by **Claims Expenses**.

6.      **REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this Coverage Section, the **Underwriter** has relied upon the declarations and statements contained in the written underwriting submission submitted by the **Parent Company** in connection with issuance of this Policy (which shall be retained on file by the **Underwriter** and shall be deemed attached hereto, as if physically attached).  Such written underwriting submission shall be construed as a separate written underwriting submission by each of the **Insureds**, and this Policy shall be considered a separate written contract with each **Insured**, except that the Limit of Liability specified in ITEM C of the Declarations shall be applicable to all **Insureds**.

With respect to the declarations, statements, information and particulars contained in such written underwriting submission, and any other declarations, statements, information, submissions and particulars provided to the **Underwriter** in connection with issuance of this Policy, no declarations, statements, information, submissions or particulars of, or knowledge or information possessed by, a **Director or Officer** shall be imputed to any other **Director or Officer** for purposes of determining whether coverage is terminated or voided in any respect.

## HOUSTON CASUALTY COMPANY

## BLENDED EXECUTIVE RISK INSURANCE POLICY

## COVERAGE SECTION B. FINANCIAL INSTITUTION PROFESSIONAL LIABILITY

**NOTICE:  THIS IS A CLAIMS-MADE AND REPORTED COVERAGE SECTION.  EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, COVERAGE HEREUNDER IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE WHILE THIS COVERAGE SECTION IS IN FORCE AND REPORTED TO THE UNDERWRITER NO LATER THAN 90 DAYS AFTER THE TERMINATION DATE OF THE POLICY PERIOD, OR, IF APPLICABLE, THE DISCOVERY PERIOD.  PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS, INCLUDING JUDGMENT OR SETTLEMENT AMOUNTS, SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES.  AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE APPLICABLE RETENTION.**

**THIS COVERAGE SECTION DOES NOT PROVIDE FOR ANY DUTY OR OBLIGATION ON THE PART OF THE UNDERWRITER TO DEFEND ANY INSURED.**

In consideration of the payment of the premium, and in reliance upon statements contained in the written underwriting submission for coverages submitted by the **Parent Company** for this Coverage Section and subject to all terms and conditions of this Coverage Section, the **Underwriter** and the **Insureds** agree as follows:

1.    **INSURING AGREEMENTS**

      The **Underwriter** will pay on behalf of the **Insured**:

(A)    all **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured** during the **Policy Period** or, if applicable, the **Discovery Period**, for a **Wrongful Act** which takes place during or prior to the **Policy Period**; provided, however, the **Insured** shall report such **Claim** to the **Underwriter** as soon as practicable, but in no event later than 90 days after termination of the **Policy Period** or, if applicable, the **Discovery Period**; and

(B)    **Professional Fees** and **Settlement Fees** in an amount not to exceed $1,000,000 (the "Voluntary Compliance Sublimit") incurred by the **Insured** as the result of its participation in any **Voluntary Compliance Program** if such participation commences during the **Policy Period** or, if applicable, the **Discovery Period**.

2.    **SPOUSAL EXTENSION**

      If a **Claim** against a natural person **Insured** includes a **Claim** against such **Insured's** lawful spouse or domestic partner solely by reason of (I) such spouse's or domestic partner's status as such (whether such status is derived by reason of statutory law, common law or otherwise), or (II) such spouse's or domestic partner's ownership interest in property or assets which the claimant seeks as recovery for alleged **Wrongful Acts** of such **Insured**, all **Loss** which such spouse or domestic partner becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Insured** becomes legally obligated to pay as a result of such **Claim**.  All limitations, conditions, provisions and other terms of coverage applicable to such **Insured** shall also be applicable to such spouse or domestic partner.  This coverage extension shall not apply to the extent the **Claim** alleges any act, error or omission by such spouse or domestic partner.

3.    **CLAIMS EXPENSES, SETTLEMENTS AND COOPERATION**

(A)    The **Underwriter** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Coverage Section where the **Loss** from such **Claim** appears reasonably likely to exceed the applicable retention amount.  The **Underwriter** may make any investigation it deems appropriate.  However, it shall be the right and duty of the **Insureds**, not the **Underwriter**, to defend any **Claim**.

(B)    The **Underwriter** shall advance **Claims Expenses** on a current basis.  As a condition of the advancement of **Claims Expenses**, the **Underwriter** may require a written undertaking from the **Company**, in a form satisfactory to the **Underwriter**, which will guarantee the repayment of any **Claims Expenses** paid to or on behalf of the **Company** if it is finally determined that the **Claims Expenses** incurred are not covered under this Policy.

(C)    The **Insureds** shall give the **Underwriter** all information and cooperation as the **Underwriter** may reasonably require and shall take reasonable steps to avoid prejudicing the **Underwriter's** position or its rights of recovery.

4.    **DEFINITIONS**

(A)    **Claim**, either in the singular or plural, means:

    (1)    a written demand for monetary, non-monetary or injunctive relief;

    (2)    a civil, criminal, administrative, regulatory or arbitration proceeding which is commenced by:

        (a)    service of a complaint or similar pleading;

        (b)    return of an indictment, information or similar document in the case of a criminal proceeding; or

        (c)    receipt or filing of a notice of charges;

    (3)    a civil, criminal, administrative or regulatory investigation:

        (a)    once an **Insured** is identified in writing by an investigating authority that a proceeding described in Section (2) above may be commenced; or

        (b)    in the case of an investigation by any state, federal or foreign governmental authority, after the service of a subpoena, target letter, Wells Notice or similar document; and

    (4)    a written notice of commencement of a fact-finding investigation by the U. S. Department of Labor or the U.S. Pension Benefit Guaranty Corporation;

for a **Wrongful Act**, including any appeal from the foregoing; provided, however, that a regulatory proceeding or investigation shall be a **Claim** only to the extent such regulatory proceeding or investigation:  (I) relates to a **Sponsored Plan** or its beneficiaries; or (II) is on behalf of, for the benefit of, or at the behest of any **Customer** or potential **Customer** of the **Insured**.

(B)    **Claims Expenses** means reasonable legal fees and expenses incurred in the defense or investigation of any **Claim**, including the premium for an appeal bond, attachment bond or similar bond (but not applying for or furnishing such bond).  **Claims Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees or other benefits of its directors, officers or employees.

(C)    **Company**, either in the singular or plural, means the **Parent Company** and/or its **Subsidiaries**, including the **Parent Company** and any **Subsidiary** as a Debtor in Possession, as such term is used in Chapter 11 of the United States Bankruptcy Code or similar provision.

(D)     **Customer**, either in the singular or plural, means any person or entity to whom or for whom, or on behalf of, or for the benefit of, an **Insured** (or any other person or entity for whose acts, errors or omissions the **Insured** is or is alleged to be legally responsible) provides services or benefits.

(E)     **Damages** means a judgment, award, surcharge or settlement as a result of a **Claim** and any award of pre- and post-judgment interest, attorneys' fees and costs.  **Damages** shall not include any:

   (1)     taxes, civil or criminal fines or penalties, other than (a) the 20% or less civil penalties imposed upon an **Insured** under Sections 502(i) and 502(l) of the Employee Retirement Income Security Act of 1974, as amended (hereinafter ERISA), or (b) penalties or fines imposed upon an **Insured** pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended;

   (2)     amounts for which the **Insured** is liable under the terms of a **Sponsored Plan** as remuneration, overhead or benefits paid or payable pursuant to the terms of such **Sponsored Plan**, other than a monetary award in, or fund for settling, a **Claim** against an **Insured** to the extent such **Claim** alleges loss to a **Sponsored Plan** or loss to the actual account(s) of one or more of participants in a **Sponsored Plan** by reason of a change in the value of investments held by such **Sponsored Plan** (including but not limited to securities issued by a **Company**), whether or not the amounts sought in such **Claim** have been characterized by plaintiffs or held by a court to be "benefits;"

   (3)     amount for which no **Insured** is financially liable or for which there is no legal recourse against any **Insured**;

   (4)     salaries or commissions of any **Insured**;

   (5)     fees, commissions or charges for **Professional Services** paid or payable to an **Insured**;

   (6)     principal, interest or other monies either paid, accrued or due an **Insured** as the result of any loan, lease or extension of credit;

   (7)     direct investment of the **Insured** in any debt or equity security underwritten by the **Insured**; or

   (8)     loss of the actual money, securities, property, **Documents** or other items of value in the custody or control of the **Insureds**, or its agents, or in transit.

**Damages** will include punitive, exemplary or the multiplied portion of any multiplied damages award.  The insurability of punitive, exemplary or multiplied damages shall be governed by the law of any applicable jurisdiction which most favors coverage for such punitive, exemplary or multiple damages.

(F)     **Discovery Period** means the period set forth in ITEM E of the Declarations.

(G)     **Documents** means deeds, wills, agreements, maps, plans, records, written or printed books, letters, certificates, or written or printed documents and/or forms of any nature whatsoever, printed or reproduced by any method, and computer systems (including cards, tapes, and magnetic discs and tapes and any other data-holding media) and microfilm.  **Documents** includes any documents in electronic format.

(H)     **Insured(s)**, either in the singular or plural, means:

   (1)     the **Company** and its predecessors in business;

   (2)     any natural persons serving as a present or future principal, partner, director, advisory director, trustee, management committee member, member of the management board, executive committee member, officer or functionally similar position (and estate of any such natural person) of the **Company**, including but not limited to a member of any committee or subcommittee of a board of the **Company**, while acting in their capacity as such on behalf of the **Company**;

(3)    any present or future employees (and estate of any such employee) of the **Company** while acting in their capacity as such on behalf of the **Company**;

(4)    any natural persons who formerly served as principal, partner, director, advisory director, trustee, management committee member, member of the management board, employee, executive committee member, officer or functionally similar position (and estate of any such natural person) of the **Company**, including but not limited to a member of any committee or sub-committee of a board of the **Company**, while acting in their capacity as such on behalf of the **Company** during the period of such service with the **Company**; and

(5)    with respect to responsibility, liability or alleged liability as it relates to **Sponsored Plans**, any:

    (a)    **Sponsored Plan**;

    (b)    past, present or future employee, partner, director, advisory director, trustee, management committee member, member of the management board, executive committee member, officer or functionally similar position (and their estate) of the **Company**, including but not limited to a member of a committee or subcommittee of a board of the **Company** or of the **Sponsored Plan**; or

    (c)    committee or other administrative body with responsibility to administer, manage or operate any **Sponsored Plan**;

    while acting or allegedly acting in any capacity with respect to any **Sponsored Plan**.

(I)    **Interrelated Wrongful Acts**, either in the singular or plural, means all causally connected **Wrongful Acts**.

(J)    **Loss** means **Claims Expenses** and **Damages**.

(K)    **Parent Company** means the entity named as such in ITEM A of the Declarations.

(L)    **Policy Period** means the period set forth in ITEM B of the Declarations.

(M)    **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos and asbestos-containing products or materials, waste (including without limitation materials which are intended to be or which have been recycled, reconditioned or reclaimed), any other similar substance and anything classified or characterized as a "Pollutant" by any federal, state, county, municipal or local agency, authority or legislative body.

(N)    **Professional Fees** means reasonable costs, charges and expenses of attorneys, accountants and/or other professionals incurred solely in investigating and evaluating a **Sponsored Plan's** actual or alleged noncompliance with any statute, rule or regulation and effecting a resolution thereof pursuant to a **Voluntary Compliance Program**.

(O)    **Professional Services** means:

(1)    services performed by the **Insured** (or by any other person or entity for whose acts, errors or omissions the **Insured** is or is alleged to be legally responsible) for, for the benefit of, or on behalf of a **Customer** or potential **Customer** of the **Insured** for a fee, commission or other consideration (or where a fee, commission or other consideration would normally be received by the **Insured**); and

(2)    **Sponsored Plan Services**.

**Professional Services** shall not include any (I) medical or healthcare services constituting the direct practice of medicine by the **Insured**, or (II) architectural services.

(P)     **Settlement Fees** means any fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority pursuant to a **Voluntary Compliance Program** as a result of a **Sponsored Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation.  **Settlement Fees** shall not include:

  (1)   any costs to correct a **Sponsored Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation or any other charges, expenses, taxes or damages; or

  (2)   any fees, fines, penalties or sanctions relating to a **Sponsored Plan** if, as of the earlier of the Inception Date of this Policy or the inception date of any policy of insurance issued by the Underwriter of which this Policy is a renewal or replacement, any **Insured** knew such **Sponsored Plan** was actually or allegedly noncompliant with any statute, rule or regulation.

(Q)     **Sponsored Plan**, either in the singular or plural, means:

  (1)   an employee benefit plan (as defined in Section 3(3) of ERISA) sponsored, established, maintained or operated solely by the **Company** or jointly by the **Company** and another organization for the benefit of the employees of the **Company** located anywhere in the world and (a) which existed before or at the Inception Date this Policy or of any policy of which this coverage section is a renewal or (b) which is created, merged or acquired after the Inception Date of this Policy; provided that, with respect to newly acquired plans in excess of $100 million in assets, the **Company** shall endeavor to inform the **Underwriter** of the plan within 120 days of its acquisition; and

  (2)   any other plan, program or policy not subject to Title I of ERISA which is or was sponsored, established, maintained or operated solely by the **Company** for the benefit of the employees of the **Company**.

(R)     **Sponsored Plan Services** means services performed with respect to or in connection with sponsorship of a **Sponsored Plan** or other activities with respect to a **Sponsored Plan**.

(S)     **Subsidiary**, either in the singular or plural, means any corporation, association, limited liability company, partnership, business trust or other organization or entity:  (1) of which the **Parent Company** directly or indirectly, including through one or more **Subsidiaries**, has or had over 50% of the voting rights representing the general right to vote for the election of directors, trustees, managing members or other governing persons or bodies of such entity or organization; or (2) which is or was both not-for-profit and sponsored by a **Company**; or (3) which is listed on a schedule attached to this Policy as a **Subsidiary** and made part of the written underwriting submission or an update thereto.

(T)     **Underwriter** means Houston Casualty Company.

(U)     **Voluntary Compliance Program** means any:

  (1)   voluntary compliance resolution program or similar voluntary settlement program administered by the United States Internal Revenue Service or Department of Labor, including but not limited to the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-In Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correction Program, Delinquent Filer Voluntary Compliance Program and Voluntary Fiduciary Correction Program; and

  (2)   similar program administered by any governmental authority located outside the United States.

(V)     **Wrongful Act** means any:

  (1)   actual or alleged act, error or omission committed by any **Insured** in the rendering of or failure to render **Professional Services**;

     (2)     any matter claimed against a natural person **Insured** due solely to such natural person **Insured's** service as a fiduciary of any **Sponsored Plan**; and

     (3)     any breach of the responsibilities, obligations or duties imposed upon the fiduciaries of the **Company**.

5.    **EXCLUSIONS**

The **Underwriter** shall not be liable to make any payment for **Loss** on account of a **Claim**:

(A)    based on or arising out of any actual or alleged facts, circumstances or situations with respect to which the **Insured**, prior to the Inception Date of this Policy, has given written notice under any policy providing the same type of coverage as this Coverage Section and of which this Policy is a renewal or replacement;

(B)    based on or arising out of a natural person **Insured** acting in a capacity as a director or officer of any entity other than a **Company** or a **Sponsored Plan**;

(C)    brought about or contributed to in fact by any:

     (1)     deliberately dishonest, fraudulent or criminal act or omission committed by an **Insured**; or

     (2)     profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

    as determined by a final adjudication in the underlying action;

(D)    for actual or alleged bodily injury (other than emotional distress or mental anguish), sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof; provided, that this Exclusion (D) shall not apply to any **Claim** arising from the loss of, damage to or destruction of, including loss of use thereof, any **Documents**;

(E)    for the insolvency, conservatorship, receivership, bankruptcy or liquidation, or suspension of payments by any broker or dealer in securities or commodities (other than the **Insured**) or any bank or banking firm (other than the **Insured**); provided, that this Exclusion (E) shall not apply to any **Claim** based on or arising out of an **Insured's** actual or alleged performance of, or failure to perform, **Professional Services**;

(F)    by, on behalf of, or at the behest of any **Insured** against any other **Insured**, except where:

     (1)     a **Claim** brought or maintained by, on behalf of, or at the behest of a natural person to whom or for whose benefit **Professional Services** were (or allegedly were) provided or who was (or allegedly was) entitled to have **Professional Services** provided to or for the benefit of him or her;

     (2)     a **Claim** brought or maintained by, on behalf of, or at the behest of (a) a participant in or beneficiary of a **Sponsored Plan**; or (b) a **Sponsored Plan**;

     (3)     a **Claim** brought or maintained by, on behalf of, or at the behest of an **Insured** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this Coverage Section; or

     (4)     a **Claim** brought or maintained by, on behalf of, or at the behest of an **Insured** for the benefit of, on behalf of, at the behest of, or as an actual or alleged fiduciary of, one or more natural persons, organizations or entities that are not **Insureds**;

(G)    for any actual or alleged seepage, contamination or pollution, including without limitation:

     (1)     any actual, alleged or threatened exposure to, or generation, transportation, discharge, omission, dispersal, release, escape, treatment, storage or disposal of, **Pollutants**; or

(2)     any governmental regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request;

provided, that this Exclusion (G) shall not apply to **Damages** (other than expenses incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effect of any **Pollutant**) incurred by any natural person **Insured** as the result of a **Claim** alleging damage to a **Sponsored Plan** for which no **Company** is required or permitted to provide indemnification or for which a **Company** is required or permitted to provide indemnification but is unable to do so solely by reason of its financial insolvency;

(H)     for the rendering of or failure to render legal services or legal advice for a fee or other-monetary consideration; provided, that this Exclusion (H) shall not apply when such legal services or legal advice are incidental to, arise out of or are related to **Professional Services** otherwise covered under this Coverage Section; or

(I)     for services performed by any entity as to which the **Insured** has acquired majority voting ownership or control after foreclosure on collateral taken as security for a loan or other extension of credit; provided, however, this Exclusion (I) shall not apply to real estate management services otherwise covered under this Coverage Section.

No act, error, omission or **Wrongful Act** pertaining to, or knowledge possessed by, any **Insured** shall be imputed to any natural person **Insured** for purposes of determining the application of any Exclusion.

If a **Claim** contains both matters that are covered by this Coverage Section and matters that are excluded or otherwise not covered, the **Parent Company** and the **Underwriter** shall use their best efforts to agree upon the **Loss** covered by this Coverage Section.  In the event that the **Parent Company** and the **Underwriter** cannot reach such an agreement, the **Underwriter** shall advance on a current basis that portion of **Loss** which it agrees to be covered.

6.     **LIMITS OF LIABILITY AND RETENTION**

(A)     The **Underwriter's** aggregate Limit of Liability for all **Loss** under this Coverage Section shall be the amount shown in ITEM C of the Declarations, whether such **Loss** is covered under one or more Insuring Agreements.  The Limit of Liability applicable to the **Discovery Period** shall be a part of, and not in addition to, the Limit of Liability shown in ITEM C of the Declarations.  The Voluntary Compliance Sublimit shall also be part of, and not in addition to, such Limit of Liability.

(B)     The **Underwriter's** liability for **Loss** arising from each **Claim** shall apply only to that part of **Loss** which is in excess of the retention amount set forth in ITEM D of the Declarations.  However, no retention shall apply to **Loss** incurred by any natural person **Insured** as the result of a **Claim** for which no **Company** is required or permitted to provide indemnification or for which a **Company** is required or permitted to provide indemnification but is unable to do so solely by reason of its financial insolvency.

(C)     All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more of the **Insureds** shall be considered a single **Claim**.  Such **Claims** shall be deemed to be first made on the date the first such **Claim** is made or deemed to be made pursuant to Section 14 of the General Terms and Conditions, regardless of whether such date is before or during the **Policy Period**.

(D)     The Limit of Liability available to pay judgments or settlements shall be reduced by **Claims Expenses**.

7.     **REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this Coverage Section, the **Underwriter** has relied upon the declarations and

statements contained in the written underwriting submission submitted by the **Parent Company** in connection with issuance of this Policy (which shall be retained on file by the **Underwriter** and shall be deemed attached hereto, as if physically attached). Such written underwriting submission shall be construed as a separate written underwriting submission by each of the **Insureds**, and this Policy shall be considered a separate written contract with each **Insured**, except that the Limit of Liability specified in ITEM C of the Declarations shall be applicable to all **Insureds**.

With respect to the declarations, statements, information and particulars contained in such written underwriting submission, and any other declarations, statements, information, submissions and particulars provided to the **Underwriter** in connection with issuance of this Policy: (I) no declarations, statements, information, submissions or particulars of, or knowledge or information possessed by, a natural person **Insured** shall be imputed to any other natural person **Insured**, and (II) except for the Chief Executive Officer or Chief Financial Officer of the **Parent Company** employed at the time such statements were made to the **Underwriter**, no declarations, statements, information, submissions or particulars of, or knowledge or information possessed by, any natural person **Insured** shall be imputed to the **Company**, for purposes of determining whether coverage is terminated or voided in any respect.

**HOUSTON CASUALTY COMPANY**

**BLENDED EXECUTIVE RISK INSURANCE POLICY**

**COVERAGE SECTION C. EMPLOYMENT PRACTICES LIABILITY**

**NOTICE:  THIS IS A CLAIMS-MADE AND REPORTED COVERAGE SECTION.  EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, COVERAGE HEREUNDER IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE WHILE THIS COVERAGE SECTION IS IN FORCE AND REPORTED TO THE UNDERWRITER NO LATER THAN 90 DAYS AFTER THE TERMINATION DATE OF THE POLICY PERIOD, OR, IF APPLICABLE, THE DISCOVERY PERIOD.  PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS, INCLUDING JUDGMENT OR SETTLEMENT AMOUNTS, SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES.   AMOUNTS INCURRED FOR LEGAL DEFENSE AND OTHER CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE APPLICABLE RETENTION.**

**THIS COVERAGE SECTION DOES NOT PROVIDE FOR ANY DUTY OR OBLIGATION ON THE PART OF THE UNDERWRITER TO DEFEND ANY INSURED.**

In consideration of the payment of the premium, and in reliance upon statements contained in the written underwriting submission for coverages submitted by the **Parent Company** for this Coverage Section and subject to all terms and conditions of this Coverage Section, the **Underwriter** and the **Insureds** agree as follows:

1.    **INSURING AGREEMENT**

The **Underwriter** will pay on behalf of the **Insured** all **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured** during the **Policy Period** or, if applicable, the **Discovery Period**, for a **Wrongful Act** which takes place during or prior to the **Policy Period**; provided, however, the **Insured** shall report such **Claim** to the **Underwriter** as soon as practicable, but in no event later than 90 days after the termination of the **Policy Period** or, if applicable, the **Discovery Period**.

2.    **EXTENSIONS**

(A)    Death, Incapacity or Bankruptcy

Subject to the limitations, conditions, provisions and other terms of this Coverage Section, in the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs or the assigns of such **Insured Person** for alleged **Wrongful Acts** of such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

(B)    Spousal Extension

If a **Claim** against an **Insured Person** includes a **Claim** against such **Insured Person's** lawful spouse or domestic partner solely by reason of (I) such spouse's or domestic partner's status as such (whether such status is derived by reason of statutory law, common law or otherwise), or (II) such spouse's or domestic partner's ownership interest in property or assets which the claimant seeks as recovery for alleged **Wrongful Acts** of such **Insured Person**, all **Loss** which such spouse or domestic partner becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Insured Person** becomes legally obligated to pay as a result of such **Claim**.  All limitations, conditions, provisions and other terms of coverage applicable to such **Insured Person**

shall also be applicable to such spouse or domestic partner.  This coverage extension shall not apply to the extent the **Claim** alleges any act, error or omission by such spouse or domestic partner.

3.    **CLAIMS EXPENSES, SETTLEMENTS AND COOPERATION**

(A)    The **Underwriter** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Coverage Section where the **Loss** from such **Claim** appears reasonably likely to exceed 25% of the applicable retention amount.  The **Underwriter** may make any investigation it deems appropriate.  However, it shall be the right and duty of the **Insureds**, not the **Underwriter**, to defend any **Claim**.

(B)    The **Underwriter** shall advance **Claims Expenses** on a current basis.  As a condition of the advancement of **Claims Expenses**, the **Underwriter** may require a written undertaking from the **Company**, in a form satisfactory to the **Underwriter**, which will guarantee the repayment of any **Claims Expenses** paid to or on behalf of the **Company** if it is finally determined that the **Claims Expenses** incurred are not covered under this Policy.

(C)    The **Insureds** shall give the **Underwriter** all information and cooperation as the **Underwriter** may reasonably require and shall take reasonable steps to avoid prejudicing the **Underwriter's** position or its rights of recovery.

4.    **DEFINITIONS**

(A)    **Benefits** means perquisites, fringe benefits, payments in connection with an employee benefit plan and any other payment (other than salary or wages) to or for the benefit of an employee arising out of the employment relationship.

(B)    **Claim**, either singular or plural, means:

   (1)    a written demand for monetary or non-monetary relief;

   (2)    a civil, administrative, regulatory or arbitration proceeding which is commenced by:

      (a)    service of a complaint or similar pleading; or

      (b)    receipt or filing of an investigative order, notice of charges or similar document;

   (3)    a civil, administrative or regulatory investigation once an **Insured** is identified or notified in writing by an investigating authority that a proceeding described in Section (2) above may be commenced,

including any appeal therefrom, which is brought and maintained by or on behalf of any past, present or prospective **Employee(s)** against any **Insured** for any **Wrongful Act**.

(C)    **Claims Expenses** means reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses incurred in the defense, investigation or appeal of a **Claim**, including the premium for an appeal, attachment or similar bond.  **Claims Expenses** shall not include wages, salaries, **Benefits** or overhead expenses.

(D)    **Company**, either in the singular or plural, means the **Parent Company** and its predecessors in business and/or its **Subsidiaries**, including the **Parent Company** and any **Subsidiary** as a Debtor in Possession or as a subject of insolvency proceedings.

(E)    **Discovery Period** means the period set forth in ITEM E of the Declarations.

(F)    **Employee(s)**, either in the singular or plural, means:  (I) any past, present or future employee of the **Company**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary employee in his or her capacity as such;

(II) an individual who is leased to the **Company**; (III) any other individual who is contracted to perform work for the **Company** or an independent contractor for the **Company**; and (IV) volunteers of the **Company**.

(G)  **Insureds**, either in the singular or plural, means the **Company** and any **Insured Persons**.

(H)  **Insured Persons** means:

  (1)  any past, present or future duly elected or appointed directors, advisory directors, officers, principals, trustees, management committee members, members of the management board, executive committee members or functionally similar positions of the **Company**, including but not limited to members of committees or subcommittees of boards of the **Company**;

  (2)  any **Employee** serving in an **Outside Position** with a **Non-Profit Entity** or **Other Entity**; or

  (3)  any **Employee**, except that an individual who is leased to the **Company**, contracted to perform for the **Company** or an independent contractor of the **Company** shall be an **Insured Person** only if the **Company** provides indemnification to such individual.

(I)  **Interrelated Wrongful Acts**, either in the singular or plural, means all causally connected **Wrongful Acts**.

(J)  **Loss** means the total amount which the **Insureds** are legally obligated to pay as a result of any **Claims**, including but not limited to damages (including front and back pay), judgments, settlement amounts, any award of costs, pre-judgment and post-judgment interest, attorneys' fees and costs, and **Claims Expenses**. **Los s** shall not include fines or penalties imposed by law, other than punitive, exemplary and multiplied damages. The insurability of punitive, exemplary or multiplied damages shall be governed by the law of any applicable jurisdiction that most favors coverage for such punitive, exemplary or multiplied damages.

(K)  **Non-Profit Entity** means any non-profit corporation, association, trust, community chest, fund, foundation or other non-profit organization or entity that is not included in the definition of **Company**.

(L)  **Other Entity** means any for-profit corporation, partnership, association, trust or other for-profit organization or entity that is scheduled as such by endorsement attached to this Policy.

(M)  **Outside Position** means the position of director, officer, principal, trustee, management committee member, member of the management board, executive committee member, advisory director or other functionally similar position held by an **Insured Person** in any **Non-Profit Entity** or any **Other Entity**, including but not limited to membership on any committee or subcommittee of a board of any **Non-Profit Entity** or **Other Entity**, if such service is at the request of, or with the knowledge and consent of, the **Company**.

(N)  **Parent Company** means the entity named as such in ITEM A of the Declarations.

(O)  **Policy Period** means the period set forth in ITEM B of the Declarations.

(P)  **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by the United States Environmental Protection Agency, or a state, country, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

(Q)  **Pollution** means:

(1)     the actual, alleged or threatened discharge, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere, or

(2)     any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so.

(R)     **Retaliation** means a **Wrongful Act** of an **Insured** relating to or alleged in response to:

(1)     the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by an **Insured** which is alleged to be a violation of any federal, state, local or foreign law, common or statutory, including but not limited to, any rule or regulation promulgated thereunder;

(2)     the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under workers' compensation laws, the Family and Medical Leave Act, the Americans with Disability Act or any other law relating to **Employee** rights;

(3)     the filing of any claims under the Federal False Claims Act, the Sarbanes-Oxley Act or any other federal, state, local or foreign "whistleblower" law; or

(4)     **Employee** strikes.

(S)     **Subsidiary**, either in the singular or plural, means any corporation, association, limited liability company, partnership, business trust or other organization or entity: (1) of which the **Parent Company** directly or indirectly, including through one or more **Subsidiaries**, has or had over 50% of the voting rights representing the general right to vote for the election of directors, trustees, managing members or other governing persons or bodies of such entity or organization; or (2) which is or was both not-for-profit and sponsored by a **Company**; or (3) which is listed on a schedule attached to this Policy as a **Subsidiary** and made part of the written underwriting submission or an update thereto.

(T)     **Underwriter** means **Houston Casualty Company**.

(U)     **Wrongful Act**, either in the singular or plural, means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted by:

(1)     the **Company**; or

(2)     the **Insured Persons** individually or otherwise in their capacity as such or in an **Outside Position** (and any matter claimed against the **Insured Persons** by reason of their serving in such capacity or in an **Outside Position**);

in connection with any actual or alleged wrongful dismissal, discharge or termination of employment; violation of employment discrimination laws (including workplace and sexual harassment); wrongful failure to employ or promote; wrongful discipline; wrongful deprivation of a career opportunity; failure to grant tenure; negligent evaluation, hiring, training, retention or supervision; employment-related defamation, misrepresentation, wrongful infliction of emotional distress or invasion of privacy; **Retaliation** (including lockout); failure to provide or enforce adequate or consistent corporate policies and procedures relating to any of the foregoing; or violation of an individual's civil rights relating to any of the foregoing.

5.     **EXCLUSIONS**

The **Underwriter** shall not be liable for **Loss** on account of any **Claim**:

(A)     based upon, arising from or in consequence of any circumstance if written notice of such circumstance has been given under any policy or coverage section of which this Coverage Section is

a renewal or replacement and if such prior policy or coverage section affords coverage (or would afford such coverage except for a exhaustion of its limits of liability) for such **Loss**, in whole or in part, as a result of such notice;

(B)    for an actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (except Section 510), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, or rules or regulations promulgated under the foregoing or amendments thereto, or similar provisions of any federal, state or local statutory law or common law; provided, that this Exclusion (B) shall not apply to any **Claim** for **Retaliation** because of the claimant's actual or alleged protected lawful activity under the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, or the Occupational Safety and Health Act;

(C)    for bodily injury (other than emotional distress, humiliation or mental anguish), sickness, disease or death of any person or for damage to or destruction of any tangible property including loss of use thereof;

(D)    based upon, arising from or in consequence of **Pollution**; provided, that this Exclusion (D) shall not apply to any **Claim** for **Retaliation** or wrongful dismissal, discharge or termination based upon, arising from or in consequence of the claimant's actual or alleged:  (1) refusal to violate any federal, state or local statutory law or common law regarding **Pollution**, or (2) disclosure regarding any actual or alleged **Pollution** by the **Company**;

(E)    for any deliberately fraudulent act or omission by an **Insured** if a final adjudication of such **Claim** adverse to such **Insured** establishes in fact such deliberately fraudulent act or omission;

(F)    for any actual or alleged obligation of an **Insured** pursuant to any workers' compensation, unemployment insurance, social security, disability benefits or similar law; provided, that this Exclusion (F) shall not apply to any **Claim** for **Retaliation** because of the claimant's actual or alleged exercise of rights pursuant to any such law;

(G)    for:

        (1)    any actual or alleged violation of any federal, state or common law relating to securities; or

        (2)    any actual or alleged purchase, sale or distribution of, or offer relating to, securities;

    provided, that this Exclusion (G) shall not apply to any **Claim** for **Retaliation** because of the claimant's actual or alleged refusal to violate such securities laws or the claimant's actual or threatened disclosure of any actual or alleged violation of such securities laws;

(H)    for liability of a person or entity (not an **Insured**) assumed by an **Insured** under any contract or agreement, either oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement; or

(I)    with respect to any **Outside Position**:

        (1)    for that portion of such **Claim** that is made against the **Non-Profit Entity** or **Other Entity** or against any director, officer, trustee, governor or any other equivalent position or employee of the **Non-Profit Entity** or **Other Entity** (but not the **Insured Person** serving in the **Outside Position**);

        (2)    for that portion of such **Claim** that is for **Wrongful Acts** committed or attempted after the date the **Insured Person** ceased to be an **Insured Person** of the **Company**;

(3)    for that portion of such **Claim** that is for **Wrongful Acts** committed or attempted prior to the date the **Insured Person** commenced serving in such **Outside Position**; or

(4)    by, on behalf of, at the direction of or in the name or right of any **Nonprofit Entity** or **Other Entity** against the **Insured Person** in such **Outside Position**, except:

    (a)    a **Claim** that is a derivative action brought or maintained by or on behalf of the **Non-Profit Entity** or **Other Entity** without the voluntary and active solicitation, assistance or participation of any director, officer, principal, trustee, management committee member, member of the management board, executive committee member or advisory director of such **Non-Profit Entity** or **Other Entity**;

    (b)    a **Claim** for contribution or indemnity, if the **Claim** directly results from another **Claim** that is otherwise covered under this Coverage Section; or

    (c)    in bankruptcy or similar proceeding by or against a **Non-Profit Entity** or **Other Entity**, a **Claim** brought by the examiner, trustee, liquidator, rehabilitator or functionally similar person or entity (or any assignee thereof) of such **Non-Profit Entity** or **Other Entity**.

The **Underwriter** shall not be liable for that part of **Loss**, other than **Claims Expenses**:

(J)    which constitutes **Benefits** due or to become due or the equivalent value of such **Benefits**; provided, that this Exclusion (J) shall not apply where such **Loss** is based upon or arises out of a **Claim** for actual or alleged wrongful dismissal, discharge or termination of employment;

(K)    which constitutes any costs for accommodation required pursuant to the Americans with Disabilities Act, the Civil Rights Act of 1964, or rules or regulations promulgated under the foregoing or amendments thereto, or similar provisions of any federal, state or local statutory law or common law; or

(L)    which constitutes the cost of compliance with any order for, grant of or agreement to provide non-pecuniary relief.

No fact, act, error, omission or **Wrongful Act** pertaining to, or knowledge possessed by, any **Insured** shall be imputed to any other **Insured** for purposes of determining the application of any Exclusion.

If a **Claim** contains both matters that are covered by this Coverage Section and matters that are excluded or otherwise not covered, the **Parent Company** and the **Underwriter** shall use their best efforts to agree upon the amount of **Loss** covered by this Coverage Section. In the event that the **Parent Company** and the **Underwriter** cannot reach such an agreement, the **Underwriter** shall advance on a current basis that portion of **Loss** which it agrees to be covered.

6.    **LIMIT OF LIABILITY AND RETENTION**

(A)    The **Underwriter's** aggregate Limit of Liability for all **Loss** under this Coverage Section shall be the amount shown in ITEM C of the Declarations, whether such **Loss** is covered under one or more Insuring Agreements (if an additional Insuring Agreement(s) is added by endorsement to this Coverage Section). The Limit of Liability applicable to the **Discovery Period** shall be a part of, and not in addition to, the Limit of Liability shown in ITEM C of the Declarations.

(B)    The **Underwriter's** liability for **Loss** arising from each **Claim** shall apply only to that part of **Loss** which is in excess of the retention amount set forth in ITEM D of the Declarations. However, no retention shall apply to **Loss** incurred by any **Insured Person** as the result of a **Claim** for which no **Company** is required or permitted to provide indemnification or for which a **Company** is required or permitted to provide indemnification but is unable to do so solely by reason of its financial insolvency.

(C)     All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more of the **Insureds** shall be considered a single **Claim**. Such **Claims** shall be deemed to be first made on the date the first such **Claim** is made or deemed to be made pursuant to Section 14 of the General Terms and Conditions, regardless of whether such date is before or during the **Policy Period**.

(D)     The Limit of Liability available to pay judgments or settlements shall be reduced by **Claims Expenses**.

## 7.    ARBITRATION

Any dispute, including but not limited to claims sounding in contract or tort, between the **Insured** and the **Underwriter** arising in connection with or relating to this Coverage Section may be submitted to binding arbitration at the **Parent Company's** request, to be exercised in its sole discretion. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by the **Parent Company**, one arbitrator selected by the **Underwriter**, and a third independent arbitrator selected by the first two arbitrators.

## 8.    REPRESENTATIONS AND SEVERABILITY

In granting coverage under this Coverage Section, the **Underwriter** has relied upon the declarations and statements contained in the written underwriting submission submitted by the **Parent Company** in connection with issuance of this Policy (which shall be retained on file by the **Underwriter** and shall be deemed attached hereto, as if physically attached). Such written underwriting submission shall be construed as a separate written underwriting submission by each of the **Insureds**, and this Policy shall be considered a separate written contract with each **Insured**, except that the Limit of Liability specified in ITEM C of the Declarations shall be applicable to all **Insureds**.

With respect to the declarations, statements, information and particulars contained in such written underwriting submission, and any other declarations, statements, information, submissions and particulars provided to the **Underwriter** in connection with issuance of this Policy: (I) no declarations, statements, information, submissions or particulars of, or knowledge or information possessed by, an **Insured Person** shall be imputed to any other **Insured Person**, and (II) except for the Chief Executive Officer or Chief Financial Officer of the **Parent Company** employed at the time such statements were made to the **Underwriter**, no declarations, statements, information, submissions or particulars of, or knowledge or information possessed by, any **Insured Person** shall be imputed to the **Company**, for purposes of determining whether coverage is terminated or voided in any respect.

# HOUSTON CASUALTY COMPANY

## BLENDED EXECUTIVE RISK INSURANCE POLICY

## COVERAGE SECTION D. FINANCIAL INSTITUTION BOND

1. **INSURING AGREEMENTS**

In consideration of the payment of the premium, and in reliance upon statements contained in the written underwriting submission for coverages submitted by the **Insured** for this Coverage Section (hereinafter "this Bond") and subject to all terms and conditions of this Bond, the **Underwriter** and the **Insured** agree that the **Underwriter** will indemnify the **Insured** for:

(A) DISHONESTY OF **EMPLOYEES**: Loss resulting directly from dishonest or fraudulent acts committed by an **Employee** acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the **Employee** with the intent:

    (1) to cause the **Insured** to sustain such loss; or

    (2) to obtain financial benefit for the **Employee** or another person or entity.

With regard to **Loans** and/or **Trading**, this Bond covers only loss resulting directly from dishonest or fraudulent acts committed by an **Employee** with the intent to make, and which results in, a financial benefit for the **Employee**. However, where the proceeds of a fraud perpetrated by an **Employee** arising from **Loans** and/or **Trading** are actually received by persons with whom the **Employee** was acting in collusion, but said **Employee** fails to derive a financial benefit therefrom, such a loss nevertheless will be covered hereunder as if the **Employee** had obtained such benefit, provided the **Insured** has established that the **Employee** intended to participate therein.

As used in this Insuring Agreement, "financial benefit" does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions. However, in determining the amount of any loss payable hereunder, the **Insured** may include payments to individual **Employees** which are bonuses, commissions and profit sharing as part of such loss, provided such payments resulted solely from the **Employee** committing a dishonest or fraudulent act as described in this Insuring Agreement.

(B) ON PREMISES BURGLARY, ROBBERY, MISPLACEMENT, ETC.

    (1) Loss of **Property** resulting directly from:

        (a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof; or

        (b) theft, false pretenses, or common-law or statutory larceny committed by a person present in an office or on the premises of the **Insured**;

    while the **Property** is lodged or deposited within offices or premises located anywhere.

    (2) Loss:

        (a) through any hazard specified in this Insuring Agreement, of any of the items enumerated in the Definition of **Property**, while such items are within any of the **Insured's** offices and in the possession of any customer of the **Insured** or any representative of such customer, or through robbery or hold-up while such customer or representative is actually transacting business with the **Insured** at an outside window or other similar facility offered to the public and attended by an **Employee**, at any of the **Insured's** offices covered hereunder; or

(b)     through robbery or hold-up during banking hours while such customer or representative is in any building or on any driveway, parking lot or similar facility maintained by the **Insured** as a convenience for such customers or representatives using motor vehicles if such customer or representative is present in such building or on such facility for the purpose of transacting banking business with the **Insured** at any of the **Insured's** offices covered hereunder, whether or not the **Insured** is liable for the loss thereof;

provided such loss, at the option of the **Insured**, is included in the **Insured's** proof of loss, but excluding in any event loss caused by such customer or any representative of such customer.

(3)    Loss of or damage to:

(a)    furnishings, fixtures, supplies or equipment within an office of the **Insured** covered hereunder resulting directly from larceny or theft in, or by hold-up, burglary or robbery of, such office or attempt thereat, or by vandalism or malicious mischief; or

(b)    such office resulting from larceny or theft in, or by hold-up, burglary or robbery of, such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief; or

(c)    any of the **Insured's** buildings in which the **Insured's** offices or branches are located caused by larceny, theft, hold-up, burglary, robbery or attempt thereat;

provided the **Insured** is the owner of such furnishings, fixtures, supplies, equipment, office or building (or is liable for such loss or damage) and the loss is not caused by fire.

(C)    IN TRANSIT: Loss of **Property** resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage thereto or destruction thereof, while the **Property** is in transit anywhere in the custody of:

(1)    a natural person acting as a messenger of the **Insured** (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger); or

(2)    a **Transportation Provider** and being transported in an armored motor vehicle; or

(3)    a **Transportation Provider** and being transported in a conveyance other than an armored motor vehicle, provided that covered **Property** transported in such manner is limited to the following:

(a)    records, whether recorded in writing or electronically;

(b)    **Certificated Securities** issued in registered form and not endorsed, or with restrictive endorsements; and

(c)    **Negotiable Instruments** not payable to bearer, or not endorsed, or with restrictive endorsements.

Coverage under this Insuring Agreement begins immediately upon the receipt of such **Property** by the natural person or **Transportation Provider** and ends immediately upon delivery to the designated recipient or its agent.

(D)    **FORGERY** OR ALTERATION: Loss resulting from:

(1)    **Forgery** or alteration of, on or in any **Negotiable Instrument** (except an **Evidence of Debt**), **Acceptance**, **Withdrawal Order**, receipt for the withdrawal of **Property**, **Certificate of Deposit** or **Letter of Credit**;

(2)    transferring, paying or delivering any funds or **Property** or establishing any credit or giving any value on the faith of any written instructions or advices directed to the **Insured** and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or

**Property**, which instructions or advices purport to have been signed or endorsed by any customer of the **Insured**, **Employee** or any financial institution, but which instructions or advices either bear a signature which is a **Forgery** or have been altered without the knowledge and consent of such customer, **Employee** or financial institution (Telegraphic, telefacsimile, cable or teletype instructions or advices as aforesaid, exclusive of transmissions by electronic funds transfer systems, sent by a person other than said customer, **Employee** or financial institution purporting to send such instructions or advices, and voice instructions or advices having been fraudulently transmitted to the **Insured** by telephone if such voice instructions or advices were made by a person who purported to represent an individual authorized to make such voice instructions or advices, shall be deemed to bear a signature which is a **Forgery**); or

(3) any **Negotiable Instrument** :

  (a) made payable to a fictitious payee and endorsed in the name of such fictitious payee; or

  (b) procured in a face-to-face transaction with the maker or drawer thereof, or anyone acting as agent of such maker or drawer, by anyone impersonating another and made or drawn payable to the one so impersonated and endorsed by anyone other than the one impersonated.

A mechanically or electronically reproduced facsimile signature is treated the same as a handwritten signature. A telefacsimile signature shall be construed to be a mechanically reproduced facsimile signature and is therefore treated the same as a handwritten signature.

(E) **FORGERY** OR ALTERATION OF SECURITIES, ETC: Loss resulting directly from the **Insured** having, in good faith, for its own account or for the account of others:

 (1) acquired, sold or delivered, or given value, extended credit or assumed liability on the faith of, any original:

  (a) **Certificated Security**;

  (b) **Document of Title**;

  (c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property;

  (d) **Certificate of Origin or Title**;

  (e) **Evidence of Debt**;

  (f) corporate, partnership or personal **Guarantee**;

  (g) **Security Agreement**;

  (h) **Instruction**;

  (i) **Statement of Uncertificated Security**; or

  (j) **Letter of Credit** which:

   (i) bears a signature of any drawee, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety or guarantor, or of any person signing in any other capacity, which is a **Forgery**;

   (ii) is altered; or

   (iii) is lost or stolen;

 (2) guaranteed in writing, guaranteed through the use of a medallion, or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, **Guarantee**, endorsement or any item listed in (a) through (j) above, or purportedly guaranteed in writing or witnessed a signature on any transfer, assignment, bill of sale, power of attorney,

**Guarantee**, endorsement or any item listed in (a) through (j) above, which purported guarantee was effected by the unauthorized use of a stamp or medallion of or belonging to the **Insured** which was lost, stolen or counterfeited and for which the **Insured** is legally liable; or

(3)    acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (h) above which is a **Counterfeit**.

Actual physical possession of the items listed in (a) through (j) above by the **Insured**, its correspondent bank or other authorized representative is a condition precedent to the **Insured's** having relied on the faith of such items. A mechanically or electronically reproduced facsimile signature is treated the same as a handwritten signature.

(F)    BROAD FORM EXTORTION

    (1)    Loss of **Property** surrendered by the **Insured** or any **Insured Person** as a result of a threat communicated to the **Insured** or **Insured Person** anywhere in the world:

        (a)    to do bodily harm to any **Insured Person** or **Guest** who is or allegedly is being held captive; or

        (b)    to do damage to the premises or **Property** of the **Insured** or **Insured Person**.

    (2)    **Expenses** incurred by the **Insured** or **Insured Person** for the purpose of investigating an extortion, paying **Property** or negotiating a release of any **Insured Person** under this Insuring Agreement, or other **Expenses** directly related to the extortion, provided such extortion is insured hereunder. The amount payable hereunder for **Expenses** incurred with respect to any one loss shall not exceed 10% of the Single Loss Limit of Liability applicable to this Insuring Agreement.

    (3)    Loss due to destruction, disappearance or wrongful appropriation of **Property** while being delivered to persons demanding the **Property** by anyone who is authorized by the **Insured** or **Insured Person**, provided such **Property** being delivered is covered under this Insuring Agreement.

As conditions precedent to the **Underwriter's** liability under this Insuring Agreement:

    (I)    the threat referred to in (1) above must occur directly as a result of the **Insured Person's** association with the **Insured**, and not as the result of such **Insured Person's** association or position with any other entity;

    (II)    the **Insured** shall have agreed to reimburse any **Insured Person** for such loss of **Property** or **Expenses** and included such reimbursement in its proof of loss;

    (III)    the **Insured** or **Insured Person** shall have approved the payment of **Property** prior to the surrender thereof and shall make every reasonable attempt to:

        (a)    determine that the kidnapping or extortion has actually occurred;

        (b)    give immediate oral or written notice to the **Underwriter**;

        (c)    notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction over the demand for **Property** and comply with such authorities' recommendations and instructions; and

        (d)    notify an associate or director or officer of the **Insured**; and

    (IV)    the **Insured** shall have established a procedure in writing and furnish a copy of that procedure to at least three senior officers, so as to enable those persons to comply with the conditions precedent in (III) above.

A connected series of events of bodily injury extortion and/or property damage extortion by one person or collaborating persons shall constitute one loss under this Insuring Agreement.

Any loss payable under this Insuring Agreement will be specifically excess of and will not contribute with any Kidnap & Ransom policy held by the **Insured**.

(G)     **COUNTERFEIT** CURRENCY:  Loss resulting directly from the receipt by the **Insured**, in good faith, of any **Counterfeit Money**, travelers checks or money orders of any national origin.

(H)     CLAIMS EXPENSE:  Reasonable expense incurred by the **Insured**, with prior consent from the **Underwriter**, solely for independent firms or individuals retained to determine the amount of loss, where:

       (1)     the loss is covered under this Bond; and

       (2)     the loss is in excess of the applicable Deductible Amount.

(I)     INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR **EMPLOYEES**

       (1)     Payments of **Money** as the **Insured**, in its own discretion, shall make to any of its directors or **Employees**, who, during the **Policy Period** and while performing any service anywhere for the **Insured**, shall have sustained bodily injury inflicted by a person while such person is committing or attempting to commit an act of larceny, theft, robbery or burglary, provided the **Underwriter's** maximum liability for the total payments made to one director or **Employee** shall not exceed $100.00 per week during the period the director or **Employee** requires medical or surgical treatment, hospital confinement or the service of a trained nurse as a result of injury inflicted during any one such event, not exceeding $2,500.00 (which shall be part of, and not in addition to, the Single Loss Limit of Liability applicable to this Insuring Agreement).

       (2)     Payments of **Money** as the **Insured**, in its own discretion, shall make to the estate of any director or **Employee**, who, during the **Policy Period** and while performing any service anywhere for the **Insured**, shall have died as the result of bodily injury inflicted by a person while such person is committing or attempting to commit an act of larceny, theft, robbery or burglary, up to the applicable Single Loss Limit of Liability (less any amounts for which the **Underwriter** is liable or has paid under (1) above).

(J)     **UNATTENDED AUTOMATED MECHANICAL DEVICES**:  Loss of **Money** while such **Money** is located within any **Unattended Automated Mechanical Device** caused by burglary or robbery, and for the damage to or destruction of such **Unattended Automated Mechanical Device** caused by burglary or robbery or attempt thereat.

(K)     **TRANSIT CASH LETTERS**

       (1)     Loss of any items enclosed in a **Transit Cash Letter** (which items shall have been lost or missing for at least 20 days after the **Insured** learns that same has not arrived at its destination), while in transit during the course of collection, presentation or payment between an office of the **Insured** and anywhere.

       (2)     Loss of any canceled checks drawn by a customer after such checks have been charged to the customer's account and after a statement of the condition of that account purporting to enclose such checks has been delivered or dispatched to the customer.

       (3)     The payment of overtime wages paid to regular **Employees** of the **Insured** and wages paid to extra **Employees** engaged in identifying the depositors of the lost items and/or assisting depositors in obtaining duplicates thereof.

       (4)     Loss of any items sent to an electronic data processor while such items are in transit, either from the **Insured** to the electronic data processor or from the electronic data processor to the **Insured**, provided that all such items are endorsed, stamped or otherwise marked in a manner that impairs further negotiability.

As a condition to the **Underwriter's** liability under this Insuring Agreement, the **Insured** shall, to the best of its ability, take and retain a photograph of the front (face) of each item bearing not more

than one endorsement and the front (face) and the back of each item bearing more than one endorsement. This condition shall not apply if no photograph is available because of the mechanical failure of the device used in making the photograph, failure of the film to reveal the image, damage to or destruction of film (developed or undeveloped) from any cause, or error or omission of any **Employee**. This condition shall not apply to checks enclosed with customers' statements or to checks in process from any branch of the **Insured** to any processing center.

(L)    SAFE DEPOSIT BOX

    (1)    Liability of Depository: Sums which the **Insured** shall become legally obligated to pay its customer for loss, damage to or destruction of **Customers' Property**.

    (2)    Loss of Customers' Property: Loss, damage to or destruction of **Customers' Property** resulting directly from burglary, robbery or attempted theft of such **Customers' Property** on the premises of the **Insured**, provided such loss is included in the **Insured'**s proof of loss.

(M)    REAL PROPERTY MORTGAGES – DEFECTIVE SIGNATURES: Loss resulting directly from the **Insured** having, in good faith and in the course of business in connection with any **Loan**, accepted or received or acted on the faith of any real property mortgages or real property deeds of trust (or like instruments pertaining to the realty or assignment of such mortgages or deeds of trust) which prove to have been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

(N)    LIABILITY TO CUSTOMER ON STOP PAYMENT ORDERS OR WRONGFUL DISHONOR OF CHECKS: Sums which the **Insured** shall become legally obligated to pay its customer for damages caused by reason of the **Insured**:

    (1)    failing to comply with any notice of such customer or any authorized representative of such customer to stop payment on any checks or drafts made or drawn by such customer; or

    (2)    wrongfully dishonoring any checks or drafts made or drawn by such customer or any authorized representative of such customer, provided that covered sums hereunder shall not include the amount of such checks or drafts or amounts paid to the payee, endorser or accommodation party of such checks or drafts.

(O)    **SERVICING CONTRACTORS**

    (1)    Loss resulting from dishonest or fraudulent acts committed by a **Servicing Contractor** acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the **Serving Contractor** with the intent:

        (a)    to cause the **Insured** to sustain such loss; or

        (b)    to obtain financial benefit for the **Servicing Contractor** or another person or entity.

    (2)    Loss of **Money** (including obligations of the United States of America) collected or received by a **Servicing Contractor** for the **Insured**, other than **Money** disbursed by such **Servicing Contractor** in accordance with instructions from the **Insured**.

As used in this Insuring Agreement, "financial benefit" does not include any benefits earned in the normal course of employment or performance of the servicing contract, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

This Bond does not afford coverage in favor of any **Servicing Contractor**. Upon the **Underwriter's** payment of any loss under this Insuring Agreement, the **Insured** shall assign to the **Underwriter** any rights and causes of action it may have against the **Servicing Contractor** to the

extent of such payment, and the **Insured** shall execute all papers necessary to secure such rights to the **Underwriter**.

(P)    FACSIMILE SIGNATURE:  Loss due to an issuer of securities, transfer agent, bank, banker or trust underwriter having received from the **Insured** or the New York Stock Exchange specimen copies of the **Insured's** mechanically reproduced facsimile signature and having acted in reliance upon any false, fraudulent or unauthorized reproduction of such facsimile signature, whether such facsimile signature is the facsimile signature duly adopted by the **Insured** or is one resembling or purporting to be such facsimile signature, regardless of by whom or by what means the same may have been imprinted, and whether or not such loss is sustained by reason of the **Insured** having entered into an agreement to be legally liable when such facsimile signature or one resembling or purporting to be such facsimile signature is used, provided that:

    (1)    such facsimile signature is used:

        (a)    as the signature to an assignment or other instrument authorizing or effecting the transfer of shares of stock, or other registered securities, which may now or at any time hereafter be registered in the name of the **Insured** on the books of the association, underwriter or corporation issuing the same; or

        (b)    as the signature to a power of substitution, designating a substitute or substitutes to make the actual transfer on the books of the issuer of shares of stock, or other registered securities, in respect of which the **Insured** may now or at any time hereafter be named as an attorney to effect said transfer, whether said power of substitution is embodied in an endorsement on the certificate of said shares for stock or other registered security or in a separate instrument; and

    (2)    the New York Stock Exchange has not interposed any objections to the use by the **Insured** of such facsimile signature, and such agreement, if any, was required by such Exchange as a condition to its failing to interpose any such objections; and

    (3)    this Insuring Agreement shall not apply to any counterfeited certificates for shares of stock or other **Certificated Securities**.

(Q)    UNAUTHORIZED SIGNATURE AND ENDORSEMENT:  Loss resulting from the **Insured** having accepted, paid or cashed any check or negotiable order of withdrawal or other **Withdrawal Order** made or drawn upon or against the account of the **Insured's** customer which bears the signature or endorsement of one other than a person whose name and signature is on file with the **Insured** as a signatory on such account.  As a condition precedent to the **Underwriter's** liability under this Insuring Agreement, the **Insured** shall have on file the signatures of all persons who are signatories on such account.

## 2.    GENERAL AGREEMENTS

(A)    NOMINEES:  Loss sustained by any nominee organized by the **Insured** for the purpose of handling certain of its business transactions and composed exclusively of its **Employees** shall, for all purposes of this Bond (and whether or not any partner of such nominee is implicated in such loss) be deemed to be loss sustained by the **Insured**.

(B)    REPRESENTATION OF **INSURED**:  No statement made by or on behalf of the **Insured** (whether contained in the application or otherwise) shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

(C)    JOINT **INSURED**:  If two or more **Insureds** are covered under this Bond, the first named **Insured** in ITEM A ("Parent Company") of the Declarations shall act for all **Insureds**.  Payment by the **Underwriter** to the Parent Company of loss sustained by any **Insured** shall fully release the **Underwriter** with respect to such loss.  If the Parent Company ceases to be covered under this Bond, the **Insured** next named (if any) shall thereafter be considered the first named **Insured**.

Knowledge possessed or discovery made by the **Parent Company's** Risk Management Department shall constitute knowledge or discovery by all **Insureds** for purposes of this Bond. The liability of the **Underwriter** for loss or losses sustained by multiple **Insureds** shall not exceed the amount for which the **Underwriter** would have been liable had all such loss or losses been sustained by one **Insured**.

(D)   COURT COSTS AND ATTORNEY'S FEES; NOTICE OF LEGAL PROCEEDINGS AGAINST **INSURED**; ELECTION TO DEFEND

    (1)   The **Underwriter** shall indemnify the **Insured** against court costs and reasonable attorneys' fees incurred and paid by the **Insured** in defending any suit or legal proceeding brought against the **Insured** to enforce the **Insured's** liability, or alleged liability, on account of any loss, claim or damage which, if established against the **Insured**, would constitute collectible loss under this Bond in excess of the applicable Deductible Amount.

    (2)   The **Insured** shall notify the **Underwriter** at the earliest practicable moment of any suit or legal proceeding described in (1) above, not to exceed 90 days after notice thereof. At the request of the **Underwriter**, the **Insured** shall furnish copies of all pleadings and other papers therein. At the **Underwriter's** election, the **Insured** shall permit the **Underwriter** to conduct the defense of such suit or legal proceeding in the **Insured's** name, through attorneys selected by the **Underwriter**. In such event, the **Insured** shall give all reasonable information and assistance (other than pecuniary) which the **Underwriter** shall deem necessary to the defense of such suit or legal proceeding.

    (3)   If the amount of the **Insured's** liability or alleged liability is greater than the amount recoverable under this Bond, then the **Underwriter's** liability under (1) above shall be limited to the proportion of court costs and attorneys' fees incurred and paid by the **Insured** or the **Underwriter** that the amount recoverable under this Bond bears to the total of such amount plus the amount which is not so recoverable. Such indemnity shall be part of the applicable Single Loss Limit of Liability. If the **Underwriter** pays court costs and attorneys' fees in excess of its proportional share of such costs and fees, the **Insured** shall promptly reimburse the **Underwriter** for such excess.

(E)   REIMBURSEMENT FOR REWARD PAYMENTS: The **Underwriter** agrees to indemnify the **Insured** up to an amount of $2,500 (per event) for any rewards paid by the **Insured** for information leading to the capture or apprehension of any person who, during the **Policy Period**, shall have robbed any of the **Insured's** messengers, or robbed or burglarized any of the **Insured's** offices or branches, or shall have made an attempt thereat.

3.   **DEFINITIONS**

(A)   **Acceptance** means a draft which the drawee has, by signature written thereon, engaged another to honor as presented.

(B)   **Certificate of Deposit** means an acknowledgement in writing by a financial institution of receipt of **Money**, with an engagement to repay it.

(C)   **Certificate of Origin or Title** means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(D)   **Certificated Security** means a share, participation or other interest in property or an enterprise of the issuer or an obligation of the issuer, which is:

    (1)   represented by an instrument issued in bearer or registered form;

    (2)   of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(3)  either one of a class or series, or by its terms divisible into a class or series, of shares, participations, interests or obligations.

(E)  **Counterfeit** means an imitation which is intended to deceive and to be taken as an original.

(F)  **Customers' Property** means:

(1)  **Money**, bonds, drafts, acceptances, other **Certificated Securities**, valuable papers, valuable documents, jewelry, silverware and other property while in customers' safe deposit boxes in vaults on the **Insured's** premises; or

(2)  the items set forth in (1) above (except **Certificated Securities** verified and recorded by the **Insured** and held by it in any capacity, or **Money** segregated and identified as payroll or other funds for delivery to the **Insured** or customer) while stored in such vaults by or for customers, or temporarily elsewhere on the premises in the course of deposit in or removal from such boxes or vaults, or while being transferred between offices of the **Insured** during the relocation of such safe deposit boxes.

**Customers' Property** may be owned by customers or held by them in any capacity, whether or not the customers are liable to others for loss thereof.

(G)  **Document of Title** means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or fungible portions of an identified mass.

(H)  **Employee** means:

(1)  an officer or other employee of the **Insured**, while employed in, at or by any of the **Insured's** offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises;

(2)  an attorney retained by the **Insured**, and an employee of such attorney, while either is performing legal services for the **Insured**;

(3)  a person provided by an employment contractor to perform employee duties for the **Insured** under the **Insured's** supervision at any of the **Insured's** offices or premises covered hereunder;

(4)  an employee of an institution merged or consolidated with the **Insured** prior to inception of the **Policy Period**;

(5)  a **Processor** (each such **Processor** and its partners, officers and employees collectively shall be deemed to be one **Employee** for purposes of this Bond);

(6)  a consultant retained by the **Insured** and any employee of such consultant while performing consulting services for the **Insured** pursuant to a written contract;

(7)  a member of the board of directors or board of trustees of the **Insured**, but only while performing acts within the scope of the customary and usual duties of any officer or other employee of the **Insured** or while acting as a member of any committee duly elected or appointed to examine or audit or have custody of or access to **Property** of the **Insured**; and

(8)  a person who is a registered representative or registered principal associated with an **Insured**, except any: (i) sole proprietor, (ii) sole stockholder, (iii) director or trustee of an **Insured** who is not performing acts within the scope of the usual duties of an officer or an **Employee**, or (iv) partner.

(I)  **Expenses** means any:

(1)     reasonable fees and expenses of independent negotiators incurred by the **Insured** under Insuring Agreement (F), provided the **Underwriter** has given its prior consent;

(2)     reward paid by the **Insured** or **Insured Person** under Insuring Agreement (F) to an **Informant** for information leading to the arrest and conviction of the individual(s) responsible for any loss under Insuring Agreement (F), provided such reward is authorized in advance by the **Underwriter** and local law enforcement authorities and such reward does not exceed 10% of the **Property** demanded at the time the reward is offered or 10% of the Single Loss Limit of Liability applicable to Insuring Agreement (F), whichever is lower;

(3)     reasonable costs of travel and accommodations incurred by an **Insured Person** under Insuring Agreement (F), provided the **Underwriter** has given its prior consent; and

(4)     costs of legal services necessary to secure the release of an **Insured Person** under Insurance Agreement (F).

(J)     **Evidence of Debt** means an instrument, including a **Negotiable Instrument**, executed by a customer of the **Insured** and held by the **Insured**, which in the regular course of business is treated as evidencing the customer's debt to the **Insured**.

(K)     **Forgery** means the signing of the name of another person or organization with intent to deceive or the use of a copy of an authorized person's signature within a telefacsimile transmission directed to the **Insured** without authority.  **Forgery** shall not include a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(L)     **Guarantee** means a written undertaking obligating the signatory to pay the debt of another to the **Insured** or its assignee or to a financial institution from which the **Insured** has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(M)     **Guest** means any person visiting the premises of the **Insured** or a residence occupied by any **Insured Person**.

(N)     **Informant** means any person (other than an **Insured Person**) who provides information not otherwise obtainable solely in return for a reward offered by the **Insured** or **Insured Person**.

(O)     **Instruction** means a written order to the issuer of an **Uncertificated Security** requesting that the transfer, pledge, or release from pledge of such **Uncertificated Security** be registered.

(P)     **Insured** means the **Parent Company** and any **Subsidiary**.

(Q)     **Insured Person** means any director, trustee, officer, employee or partner of the **Insured** (or a relative or any other resident in the household of such persons).

(R)     **Letter of Credit** means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment upon compliance with the conditions specified in such letter of credit.

(S)     **Loan** means all extensions of credit by the **Insured**, all transactions creating a creditor relationship in favor of the **Insured**, and all transactions by which the **Insured** assumes an existing creditor relationship.

(T)     **Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

(U)     **Negotiable Instrument** means any writing which:

(1)     is signed by the maker or drawer;

    (2)    contains an unconditional promise or order to pay a sum certain in **Money** (and no other promise, order, obligation or power given by the maker or drawer);

    (3)    is payable on demand or at a definite time; and

    (4)    is payable to order or bearer.

(V)    **Parent Company** means the entity named as such in ITEM A of the Declarations.

(W)    **Processor** means a natural person, partnership or corporation authorized by the **Insured** to perform services as a data processor of checks or other accounting records of the **Insured** (but not including preparation or modification of computer software or programs).  **Processor** shall not include a Federal Reserve Bank or clearing house.

(X)    **Policy Period** means the period set forth in ITEM B of the Declarations.

(Y)    **Property** means **Money**, **Certificated Securities**, **Uncertificated Securities**, **Negotiable Instruments**, **Certificates of Deposit**, **Documents of Title**, **Acceptances**, **Evidences of Debt**, **Security Agreements**, **Withdrawal Orders**, **Certificates of Origin or Title**, **Letters of Credit**, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records (whether recorded in writing or electronically), gems, jewelry, precious metals in any form, and tangible items of personal property which are not hereinbefore enumerated.

(Z)    **Security Agreement** means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

(AA)    **Servicing Contractor** means a natural person, partnership or corporation authorized by the **Insured** to perform the following services:

    (1)    collect and record payments on real estate mortgage or home improvement loans made, held or assigned to the **Insured**, and establish tax and insurance escrow accounts;

    (2)    manage real property owned by or under the supervision or control of the **Insured**; or

    (3)    other actions directly related to (1) or (2) above;

but not including the sale of real property mortgages to the **Insured** by any **Servicing Contractor** or affiliate of a **Servicing Contractor**.

Each **Servicing Contractor** and its partners, officers and employees collectively shall be deemed to be one **Servicing Contractor** for purposes of this Bond.

(BB)    **Statement of Uncertified Security** means a written statement of the issuer of an **Uncertificated Security** which contains:

    (1)    a description of the issue of which the **Uncertificated Security** is a part;

    (2)    the number of shares or units:

        (a)    transferred to the registered owner;

        (b)    pledged by the registered owner to the registered pledgee;

        (c)    released from pledge by the registered pledgee;

        (d)    registered in the name of the registered owner on the date of the statement; or

        (e)    subject to pledge on the date of the statement;

    (3)    the name and address of the registered owner and registered pledgee;

    (4)    a notation of any liens and restrictions of the issuer and any adverse claims to which the **Uncertificated Security** is or may be subject, or a statement that there are no such liens, restrictions or adverse claims; and

    (5)    the date:

        (a)    the transfer of the shares or units to the new registered owner of the shares or units was registered;

        (b)    the pledge of the registered pledgee was registered; or

        (c)    of the statement, if it is a periodic or annual statement.

(CC)    **Subsidiary**, either in the singular or plural, means any corporation, association, limited liability company, partnership, business trust or other organization or entity: (1) of which the **Parent Company** directly or indirectly, including through one or more **Subsidiaries**, has or had over 50% of the voting rights representing the general right to vote for the election of directors, trustees, managing members or other governing persons or bodies of such entity or organization; or (2) which is or was both not-for-profit and sponsored by an **Insured**; or (3) which is listed on a schedule attached to this Policy as a **Subsidiary** and made part of the written underwriting submission or an update thereto.

(DD)    **Trading** means any purchase, exchange or sale transaction, with or without the knowledge of the **Insured**, whether or not represented by any indebtedness or balance shown to be due the **Insured** on any customer account, actual or fictitious.

(EE)    **Transit Cash Letter** means any letter dispatched by the **Insured**, any of its correspondent banks and/or any Federal Reserve Bank or branch thereof itemizing by separate amounts all checks, promissory notes, drafts or any similar items enclosed therewith which shall have been accepted by the **Insured** for deposit, payment, collection or encashment.

(FF)    **Transportation Provider** means any organization which provides its own or leased vehicles for transportation or which provides freight forwarding or air express services.

(GG)    **Unattended Automated Mechanical Devices** means automated mechanical devices which, on behalf of the **Insured**, disburse **Money**, accept deposits, cash checks, drafts or similar written instruments, or make credit card loans and which are not situated within, attached to or made a part of an office of the **Insured** permanently staffed by an **Employee** whose duties are those usually assigned to a teller.

(HH)    **Uncertificated Security** means a share, participation or other interest in property or an enterprise of the issuer or an obligation of the issuer, which is:

    (1)    not represented by an instrument the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer;

    (2)    of a type commonly dealt in on securities exchanges or markets; and

    (3)    either one of a class or series, or by its terms divisible into a class or series, of shares, participations, interests or obligations.

(II)    **Underwriter** means Houston Casualty Company.

(JJ)    **Withdrawal Order** means a non-negotiable instrument, other than an **Instruction**, signed by a customer of the **Insured** authorizing the **Insured** to debit the customer's account in the amount of funds stated therein.

4.    **EXCLUSIONS**

This Bond does not cover:

(A)    loss resulting directly or indirectly from **Forgery** or alteration, except when covered under Insuring Agreement (A), (D), (E) or (G);

(B)    loss due to riot or civil commotion outside the United States of America, Canada or any other country in which the **Insured** is located or loss due to military, naval or usurped power, war or insurrection, unless:

    (1)    such loss occurs in transit in the circumstances recited in Insuring Agreement (C); and

    (2)    when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the **Insured** in initiating such transit;

(C)    loss from the effects of nuclear fission or fusion or radioactivity resulting directly or indirectly from non-industrial uses of nuclear energy;

(D)    that portion of any loss resulting directly or indirectly from any acts of any director of the **Insured** other than one employed as a salaried, pensioned or elected official or an **Employee** of the **Insured**, except:

    (1)    when performing acts coming within the scope of the usual duties of an **Employee**; or

    (2)    while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the **Insured** to perform specific, as distinguished from general, directorial acts on behalf of the **Insured**;

(E)    loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any **Loan**, transaction involving the **Insured** as lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or **Evidences of Debt**, whether or not such **Loan**, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), (E) or (M);

(F)    loss of **Property** contained in customers' safe deposit boxes, unless:

    (1)    the **Insured** is legally liable therefore and the loss is covered under Insuring Agreement (A); or

    (2)    the loss is covered under Insuring Agreement (L);

(G)    loss caused by an **Employee**, except:

    (1)    when covered under Insuring Agreement (A); or

    (2)    when covered under Insuring Agreement (B) or (C) and such loss results directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to **Property**;

(H)    loss involving any **Unattended Automated Mechanical Device**, except when covered under Insuring Agreement (J);

(I)    loss resulting directly or indirectly from trading, with or without the knowledge of the **Insured**, whether or not represented by any indebtedness or balance shown to be due to the **Insured** on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any **Employee** in connection with any account relating to such trading, indebtedness or balance, except when covered under Insuring Agreement (A), (E) or (N);

(J)  shortage in any teller's cash due to error, regardless of the amount of such shortage (Any shortage in any teller's cash which is not in excess of the normal shortage in the tellers' cash in the office where such shortage occurs shall be presumed to be due to error);

(K)  loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards:

    (1)  in obtaining credit or funds;

    (2)  in gaining access to automated mechanical devices which, on behalf of the **Insured**, disburse **Money**, accept deposits, cash checks, drafts or similar written instruments, or make credit card loans; or

    (3)  in gaining access to point-of-sale terminals, customer-bank communication terminals or similar electronic terminals of electronic funds transfer systems;

    whether such cards were issued, or purport to have been issued, by the **Insured** or by anyone other than the **Insured**, except when covered under Insuring Agreement (A) or (J);

(L)  loss (including loss of **Property**) involving any automated mechanical device (whether or not such automated mechanical device is an **Unattended Automated Mechanical Device**) which, on behalf of the **Insured**, disburses **Money**, accepts deposits, cashes checks, drafts or similar written instruments, or makes credit card loans, resulting from:

    (1)  damage to such automated mechanical device caused by vandalism or malicious mischief, unless such vandalism or malicious mischief is perpetrated from within an office of the **Insured**;

    (2)  mechanical breakdown or the failure of such automated mechanical device to function properly; or

    (3)  misplacement or mysterious unexplainable disappearance of **Property** or **Money** located within any such automated mechanical device, except when covered under Insuring Agreement (A) or (J);

(M)  loss through the surrender of **Property** away from an office of the **Insured** as a result of a threat:

    (1)  to do bodily harm to any person, except loss of **Property** in transit under Insuring Agreement (C) in the custody of a person acting as messenger, provided that when such transit was initiated, there was no knowledge by the **Insured** of any such threat; or

    (2)  to do damage to the premises or property of the **Insured**, except when covered under Insuring Agreement (A) or (F);

(N)  loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or representative of such depositor within the office of the **Insured** at the time of such payment or withdrawal, or except when covered under Insuring Agreement (A);

(O)  loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to **Forgery** or any other fraud, except when covered under Insuring Agreement (A);

(P)  loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreement (A), (E) or (G);

(Q)  loss of any tangible item of personal property which is not specifically enumerated in the Definition of **Property** for which the **Insured** is legally liable, if such property is specifically insured by other insurance of any kind and in any amount obtained by the **Insured**, and in any event loss of such

property occurring more than 60 days after the **Insured** shall have become aware that it is liable for the safekeeping of such property, except when covered under Insuring Agreement (A), (B)(3) or (L);

(R)    loss of **Property** while:

    (1)    in the mail, except when covered under Insuring Agreement (A) or (K); or

    (2)    in the custody of any **Transportation Provider**, except when covered under Insuring Agreement (C);

(S)    potential income, including but not limited to interest and dividends, not realized by the **Insured**;

(T)    damages of any type for which the **Insured** is legally liable, except direct compensatory damages (but not multiples thereof) arising directly from a loss covered under this Bond;

(U)    all fees, costs and other expenses incurred by the **Insured** in establishing the existence or amount of loss covered under this Bond, except when covered under Insuring Agreement (H);

(V)    indirect or consequential loss of any nature;

(W)    loss resulting from any violation by the **Insured** or any **Employee** of:

    (1)    any law regulating:

        (a)    the issuance, purchase or sale of securities;

        (b)    securities transactions on securities exchanges or over the counter markets;

        (c)    investment companies; or

        (d)    investment advisers, or

    (2)    any rule or regulation made pursuant to any such law;

unless the **Insured** has established that the act or acts which caused such loss involved fraudulent or dishonest conduct which would have caused a loss to the **Insured** in a similar amount in the absence of such laws, rules or regulations;

(X)    loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver on demand of the **Insured** funds or **Property** of the **Insured** held by it in any capacity, except when covered under Insuring Agreement (A) or (B)(1)(a);

(Y)    loss involving any **Uncertificated Security**, except an **Uncertificated Security** of any Federal Reserve Bank of the United States or when covered under Insuring Agreement (A) or (E);

(Z)    damages resulting from any civil, criminal or other legal proceeding in which the **Insured** is adjudicated to have engaged in racketeering activity, except when the **Insured** has established that the act or acts giving rise to such damages were committed by an **Employee** under circumstances which result directly in a loss to the **Insured** covered by Insuring Agreement (A) (For purposes of this Exclusion (Z), "racketeering activity" is defined in 18 U.S.C. §1961 et seq., as amended);

(AA)    with respect to Insuring Agreement (A):

    (1)    liability of the **Insured** under any agreement or contract to be responsible for loss, unless such liability would attach without such agreement or contract; or

    (2)    loss also insured under nuclear energy liability insurance issued by the Nuclear Energy Liability Association or the Mutual Atomic Energy Liability Underwriters in effect at the time of the occurrence resulting in such loss (Such nuclear energy liability insurance shall be deemed to be in effect at the time of such occurrence notwithstanding exhaustion of its limit of liability);

(BB)  with respect to Insuring Agreement (B):

    (1)  loss by moths, vermin, wear and tear, gradual deterioration or inherent vice; or

    (2)  loss due to nuclear reaction, nuclear radiation or radioactive contamination or to any act or condition incident to any of the foregoing;

(CC)  with respect to Insuring Agreement (F):

    (1)  the confiscation or expropriation of any reward or **Property** by any governmental authority;

    (2)  the surrender of **Property** in any face-to-face encounter involving the use or threat of force or violence, unless surrendered by a person who is in possession of such **Property** at the time of surrender for the sole purpose of conveying such **Property** to pay a previously communicated demand for such **Property**; or

    (3)  the surrender of **Property** on the premises where the demand is made, unless brought onto such premises after receipt of the demand for such **Property** for the sole purpose of paying such demand, and only to the extent that any **Property** on such premises at the time was insufficient to pay such demand;

(DD)  with respect to Insuring Agreement (L), any **Property** held by the **Insured** in trust for more than 30 days or as collateral;

(EE)  with respect to Insuring Agreement (O):

    (1)  loss resulting from the insolvency, bankruptcy or taking over by a receiver or other liquidator or any State or Federal official of any depository institution, unless such depository institution is a **Servicing Contractor** covered under this Bond and such insolvency, bankruptcy or taking over results from fraud or dishonesty of officers or employees of such depository institution; or

    (2)  loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any **Loan** made to a **Servicing Contractor**, including any such **Loan** established to provide funds for interim financing or "warehousing" of mortgage loans, whether or not such **Loan** was procured in good faith or through trick, artifice, fraud or false pretenses, or loss resulting directly or indirectly from the failure of the **Servicing Contractor** to pay over **Property** held as security for any such **Loan**; or

(FF)  with respect to Insuring Agreement (O)(2):

    (1)  loss through the failure of any **Servicing Contractor** to collect or receive **Money** for the account of the **Insured** (notwithstanding any agreement between such **Servicing Contractor** and the **Insured** to the contrary); or

    (2)  loss of **Money** collected or received for the account of the **Insured** by any **Servicing Contractor**, unless such **Servicing Contractor** is legally liable to the **Insured** on account of the loss of such **Money**.

5.  **DISCOVERY**

This Bond applies to loss discovered by the **Insured** during the **Policy Period**.  Discovery occurs when the **Insured's** Insurance Risk Management Department first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the **Parent Company's** Insurance Risk Management Department receives notice of an actual or potential claim in which it is alleged that the **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this Bond.

6.   **LIMITS OF LIABILITY; DEDUCTIBLE AMOUNT; NON-ACCUMULATION OF LIABILITY**

(A)   AGGREGATE LIMIT OF LIABILITY

The **Underwriter's** aggregate Limit of Liability under all Insuring Agreements of this Bond combined (including any that may be added by endorsement) for all loss(es) discovered during the **Policy Period**, and any other amounts that may be payable under this Bond, regardless of when paid, shall be the amount shown in ITEM C of the Declarations ("Aggregate Limit of Liability"). Any payments under this Bond shall reduce, and may exhaust, such Aggregate Limit of Liability. In the event of exhaustion:

(1)   the **Underwriter** shall have no further liability under any Insuring Agreement for any loss(es) discovered during the **Policy Period**, whether or not previously reported to the **Underwriter**; and

(2)   upon notice by the **Underwriter** to the **Insured** that such Aggregate Limit of Liability has been exhausted, the **Underwriter** shall have no further obligation of payment of indemnification of court costs or attorney fees as described in General Agreement (D), whether or not the **Underwriter** has elected to defend any action(s) thereunder.

The Aggregate Limit of Liability for the **Policy Period** shall not be increased or reinstated by any recovery made and applied in accordance with subsections (a), (b) or (c) of Section 9 or by any remaining portion of any aggregate limit of liability from any previous policy period. In the event a loss of **Property** is settled by the **Underwriter** through the use of a lost instrument bond, such loss shall not reduce the Aggregate Limit of Liability.

(B)   SINGLE LOSS LIMIT OF LIABILITY

The **Underwriter's** liability for each Single Loss under this Bond shall not exceed the applicable Single Loss Limit of Liability shown in the Bond Table attached hereto. Each Single Loss Limit of Liability shall be part of, and not in addition to, the Aggregate Limit of Liability. If a Single Loss is covered under more than one Insuring Agreement, the **Underwriter's** liability shall not exceed the largest applicable Single Loss Limit of Liability or the remaining Aggregate Limit of Liability, whichever is less. As used herein, "Single Loss" means all covered loss and any other amounts that may be payable under this Bond, including court costs and attorneys' fees incurred by the **Underwriter** under General Agreement (D), resulting from:

(1)   any one act or series of related acts of burglary, robbery or attempt thereat, in which no **Employee** is implicated;

(2)   any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an **Employee** or not) resulting in damage to or destruction or misplacement of **Property**;

(3)   all acts or omissions, other than those specified in (1) or (2) above, caused by any person (whether an **Employee** or not) or in which such person is implicated; or

(4)   any one casualty or event not specified in (1), (2) or (3) above.

(C)   NON-ACCUMULATION OF LIABILITY:   Neither the Aggregate Limit of Liability nor any Single Loss Limit of Liability of the **Underwriter** shall be cumulative in amount from policy period to policy period, regardless of the number of years this Bond may be in force, the number of times this Bond may be renewed or the number of premiums which shall be payable or paid.

(D)    LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE

With respect to any loss under this Bond which is recoverable or recovered in whole or in part under any other bonds or policies issued by the **Underwriter** to the **Insured** (or any predecessor in interest of the **Insured**) and terminated or canceled or allowed to expire, and with respect to which the period for discovery has not expired at the time any such loss is discovered, the total liability of the **Underwriter** with respect to such loss shall not exceed the larger of the available applicable limits of liability.

If the coverage of this Bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an insurer other than the **Underwriter** and terminated, canceled or allowed to expire, then with respect to any loss sustained prior to such termination, cancelation or expiration and discovered within the period permitted under such other bond or policy, the **Underwriter** shall be liable only for that part of such loss which exceeds the amount recoverable or recovered under such other bond or policy (notwithstanding anything to the contrary in such other bond or policy).

(E)    DEDUCTIBLE AMOUNT

The **Underwriter** shall be liable under this Bond only for the amount by which any Single Loss exceeds the applicable Deductible Amount shown in the Bond Table attached hereto, and in all events the **Underwriter's** liability shall be subject to the Aggregate Limit of Liability and the applicable Single Loss Limit of Liability.

In the time and in the manner prescribed in this Bond, the **Insured** shall give the **Underwriter** notice of any loss of a type covered by this Bond that exceeds or may exceed the applicable Deductible Amount, whether or not the **Underwriter** is liable for such loss, and upon the **Underwriter's** request the **Insured** shall file a brief statement giving the particulars concerning such loss.

7.    **NOTICE & PROOF OF LOSS; LEGAL PROCEEDINGS AGAINST UNDERWRITER**

(A)    Within a reasonable time after discovery of loss, the **Insured** shall give the **Underwriter** notice thereof.  Notice by the **Insured** shall mean notice by the **Insured's** Insurance Risk Management Department.

(B)    Within six months after such discovery, the **Insured** shall furnish to the **Underwriter** a proof of loss, duly sworn to, with full particulars.

(C)    Lost **Certificated Securities** listed in the proof of loss shall be identified by certificate or bond numbers (if such securities were issued therewith).

(D)    Lost **Uncertificated Securities** held in book entry form or in bulk by the issuer, clearing agency or custodian may be identified in a proof of loss by the presentation of the statement(s) of such issuer, clearing agency or custodian reflecting the **Insured's** interest therein instead of by certificate number.

(E)    Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the **Underwriter** or after the expiration of 24 months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against the **Insured** in the circumstances recited in General Agreement (D) or to recover attorneys' fees paid in any such suit shall be brought within 24 months from the date upon which the judgment and such suit shall become final.

(F)    If any limitation embodied in this Bond is prohibited by any law controlling the construction thereof, such limitation shall be deemed to be amended so as to equal to the minimum period of limitation provided by such law.

(G)     This Bond is for the use and benefit only of the **Insured** and the **Underwriter** shall not be liable hereunder for loss sustained by anyone other than the **Insured**. No suit, action or legal proceedings shall be brought hereunder by any one other than the first named **Insured**.

8.    **VALUATION**

Any loss of **Money**, or loss payable in **Money**, shall be paid, at the option of the **Insured**, in the **Money** of the country in which the loss was sustained or in the United States dollar equivalent thereof determined at the rate of exchange at the time of payment of such loss.

(A)     SECURITIES

The **Underwriter** shall settle in kind its liability under this Bond on account of a loss of any securities or, at the option of the **Insured**, shall pay to the **Insured** the cost of replacing such securities, determined by their highest quoted market value at any time between the business day next preceding the discovery of the loss and the day on which the loss is settled. In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof. If such securities cannot be replaced or have no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If any applicable coverage under this Bond is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the **Insured** in full for the loss of securities for which claim is made hereunder, the liability of the **Underwriter** under this Bond shall be limited to payment for, or duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

If, at the request of the **Underwriter**, the **Insured** or any customer of the **Insured** shall become Principal upon any bonds, or shall give any undertakings required as a prerequisite to the reissuing or duplicating of any securities for the loss of which the **Underwriter** is liable under this Bond, the **Underwriter** will become surety upon such bonds or undertakings without premium charge and will indemnify the **Insured** or such customer against any loss which the **Insured** or such customer may sustain by reason of having become Principal upon any such bonds or having given any such undertakings. The amount of indemnity under this paragraph shall not exceed the applicable Single Loss Limit of Liability.

(B)     BOOKS OF ACCOUNT AND OTHER RECORDS: In case of loss of, or damage to, any books of account or other records used by the **Insured** in its business, the **Underwriter** shall be liable under this Bond only if such books or records are actually reproduced, and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the **Insured** in order to reproduce such books and other records.

(C)     **PROPERTY** OTHER THAN **MONEY**, SECURITIES OR RECORDS: In case of loss of, or damage to, any **Property** other than **Money**, securities, books of account or other records, or damage covered under Insuring Agreement (B)(3), the **Underwriter** shall not be liable for more than the actual cash value of such **Property**, or of items covered under Insuring Agreement (B)(3). At its election, the **Underwriter** may pay the actual cash value of, replace, or repair such **Property**. Disagreement between the **Underwriter** and the **Insured** as to the cash value or adequacy of repair or replacement shall be resolved by arbitration.

(D)     PRECIOUS METALS: The **Underwriter** shall settle in kind its liability under this Bond on account of a loss of any precious metals or, at the option of the **Insured**, shall pay to the **Insured** the cost of replacing such precious metals, determined as follows:

(1)     in respect of gold, at the U.S. AM fix price for gold on the next business day following the date of discovery of the loss;

(2)    in respect of silver, at the last Handy and Harmon posted price for silver on the next business day following the date of loss; and

(3)    in respect of coin, bullion and strategic elements, at the closing market value on the next business day following the date of loss.

(E)    TRAVELERS CHECKS:  In case of loss of, or damage to, travelers checks, the **Underwriter** shall not be liable for more than either:

(1)    the face value of the lost or stolen travelers checks, where in good faith payment is made or credit is given due to subsequent presentation; or

(2)    the cost to reissue lost or stolen travelers checks.

## 9.  ASSIGNMENT; SUBROGATION; RECOVERY; COOPERATION

(A)    In the event of payment under this Bond, the **Insured** shall deliver, if so requested by the **Underwriter**, an assignment of such of the **Insured's** rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(B)    In the event of payment under this Bond, the **Underwriter** shall be subrogated to all of the **Insured's** rights of recovery therefor against any person or entity to the extent of such payment.

(C)    Recoveries, whether effected by the **Underwriter** or by the **Insured**, shall be applied net of the expense of such recovery:  first, to the satisfaction of the **Insured's** loss which would otherwise have been paid but for the fact that it is applicable Single Loss Limit of Liability or the Aggregate Limit of Liability; second, to the **Underwriter** as reimbursement of amounts paid in settlement of the **Insured's** claim; and third, to the **Insured** in satisfaction of the applicable Deductible Amount.  Recovery on account of loss of securities as set forth in the second paragraph of Section 8(A) above or recovery from reinsurance and/or indemnity of the **Underwriter** shall not be deemed a recovery for purposes of this Section 9(C).

(D)    Upon the **Underwriter's** request and at reasonable times and places designated by the **Underwriter**, the **Insured** shall:

(1)    submit to examination by the **Underwriter** and subscribe to the same under oath;

(2)    produce for the **Underwriter's** examination all pertinent records; and

(3)    cooperate with the **Underwriter** in all matters pertaining to the loss.

(E)    The **Insured** shall execute all papers and render assistance to secure to the **Underwriter** the rights and causes of action provided for herein.  The **Insured** shall do nothing after discovery of loss to prejudice such rights or causes of action.

(F)    The **Underwriter** may examine and audit the relevant books and records of the **Insured** at any time during the **Policy Period** (including any extension thereof) and within 30 days thereafter for the purpose of substantiating any amounts paid under this Bond.

## 10.  OWNERSHIP

This Bond shall apply to loss of **Property** (i) owned by the **Insured**, (ii) held by the **Insured** in any capacity, or (iii) for which the **Insured** is legally liable.  This Bond shall be for the sole use and benefit of the **Insured**.  However, where expressly provided for, the Insuring Agreements of this Bond shall be deemed to include amounts which the **Insured** is legally liable to pay a third party as a direct result of loss otherwise meeting the conditions and limitations of this Bond.

11.    **TERMINATION OR CANCELLATION**

(A)    This Bond terminates as an entirety immediately upon the taking over of the **Insured** by a receiver or other liquidator or by any State or Federal official or agency, or immediately upon the **Underwriter's** receipt of a written notice from the **Insured** of its decision to terminate this Bond.

(B)    This Bond terminates as to any **Employee**, or as to any partner, officer or employee of any **Processor**:

    (1)    as soon as the **Parent Company's** Insurance Risk Manager (not in collusion with such person) learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the **Insured** or otherwise, whether or not such act is of the type covered by Insuring Agreement (A), and whether or not such act is against the **Insured** or any other person or entity (without prejudice to the loss of any **Property** then in transit under Insuring Agreement (C) in the custody of such person); or

    (2)    15 days after the **Insured's** receipt of a written notice from the **Underwriter** of its desire to cancel this Bond as to any such person (The mailing by the **Underwriter** of such notice to the address set forth in ITEM A of the Declarations shall be sufficient proof of notice).

(C)    If this Bond is terminated as to any **Employee** pursuant to (B)(1) above, the **Underwriter** will automatically reinstate coverage as to such **Employee** without specific submission or approval if:

    (1)    the **Insured's** Human Resources Department recommends that coverage be reinstated with respect to such **Employee**; and

    (2)    such **Employee's** dishonest or fraudulent act(s) were committed more than three years prior to the date the **Insured** learned thereof (and were not committed in the course of or in connection with such **Employee's** employment with the **Insured**).

The **Insured** agrees to keep full written records concerning the above, with all approvals signed and dated by the approving persons concerned, and it will make such records available to the **Underwriter** upon request. If the **Employee's** dishonest or fraudulent act(s) were committed in the course of or in connection with such **Employee's** employment with the **Insured**, that **Employee's** individual circumstances must be submitted to the **Underwriter** for approval. If, however, prior to inception of the **Policy Period**, the issuer of a prior bond agreed to provide coverage with respect to an **Employee** pursuant to a special agreement with the **Insured**, this Bond will continue to apply with respect to such **Employee**.

(D)    This Bond terminates as to any **Servicing Contractor**:

    (1)    as soon as the **Parent Company's** Insurance Risk Manager (not in collusion with such **Servicing Contractor**) learns of any dishonest or fraudulent act committed by such **Servicing Contractor** at any time; or

    (2)    30 days after the **Insured's** receipt of a written notice from the **Underwriter** of its desire to cancel this Bond as to such **Servicing Contractor** (The mailing by the **Underwriter** of such notice to the address set forth in ITEM A of the Declarations shall be sufficient proof of notice).

(E)    If this Bond is terminated as to any **Servicing Contractor** pursuant to (D)(1) above, the **Underwriter** will automatically reinstate coverage as to such **Servicing Contractor** without specific submission or approval if:

    (1)    the **Insured's** Human Resources Department recommends that coverage be reinstated with respect to such **Servicing Contractor**; and

    (2)    such **Servicing Contractor's** dishonest or fraudulent act(s) were committed more than three years prior to the date of the **Insured** learned thereof.

The **Insured** agrees to keep full written records concerning the above, with all approvals signed and dated by the approving persons concerned, and it will make such records available to the **Underwriter** upon request.  If, prior to inception of the **Policy Period**, the issuer a prior bond agreed to provide coverage with respect to a **Servicing Contractor** pursuant to a special agreement with the **Insured**, this Bond will continue to apply with respect to such **Servicing Contractor**.

(F)     Termination of this Bond as described above means termination of liability as to loss(es) discovered after the effective date of such termination.

## 12.     RIGHTS AFTER TERMINATION OR CANCELLATION

(A)     Upon termination or cancellation of this Bond as an entirety (whether by the **Insured** or the **Underwriter**), the **Insured** may elect to purchase under this Bond an additional period of one year within which to discover loss sustained by the **Insured** prior to the effective date of such termination or cancellation.  This right shall terminate, however, unless the **Insured**:

    (1)     provides written notice to the **Underwriter** of such election; and

    (2)     pays an additional premium of 150% of the amount set forth in ITEM F of the Declarations;

within 10 days after the effective date of such termination or cancellation.

(B)     The **Underwriter** shall give its written consent to the **Insured's** purchase of an additional period described in (A) above upon receipt of the notice and additional premium described in (A) above.  However, such additional period shall terminate immediately upon:

    (1)     the effective date of any other insurance obtained by the **Insured**, its successor in business or any other party, replacing in whole or in part the insurance afforded by this Bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

    (2)     any takeover of the **Insured** by a receiver or other liquidator or by any State or Federal official or agency, without the necessity of the **Underwriter** giving notice of such termination.  In such event, the **Underwriter** shall refund any unearned premium.  The right to purchase such additional period may not be exercised by any such receiver, liquidator, official or agency.

(C)     SOLD SUBSIDIARIES

    (1)     With respect to any subsidiary sold by the **Insured** during the **Policy Period**, this Bond shall terminate on the effective date of such sale.  The **Insured** may elect to purchase under this Bond an additional period of 120 days within which to discover loss sustained by such subsidiary prior to the effective date of such sale.  This right to shall terminate, however, unless the **Insured**:

        (a)     provides written notice to the **Underwriter** of such election; and

        (b)     pays an additional premium of no more than 30% (based on the relationship of the sold subsidiary's assets and other rating factors to the consolidated assets and other rating factors of the **Insured**);

prior to the effective date such subsidiary is sold.

    (2)     The **Underwriter** shall give its written consent to the **Insured's** purchase of an additional period described in (1) above upon receipt of the notice and additional premium described in (1) above.  However, such additional period shall terminate immediately upon:

        (a)     the effective date of any other insurance obtained by the **Insured**, its successor in business or any other party, replacing in whole or in part the insurance afforded by

this Bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

(b)    any takeover of the **Insured** by a receiver or other liquidator or by any State or Federal official or agency, without the necessity of the **Underwriter** giving notice of such termination. In such event, the **Underwriter** shall refund any unearned premium. The right to purchase such additional period may not be exercised by any such receiver, liquidator, official or agency.

13.    **CHANGES IN EXPOSURE**

(A)    If, during the **Policy Period**, the **Insured** merges or consolidates with, or purchases or acquires assets or liabilities of another institution, the **Insured** shall not have the coverage afforded under this Bond for loss which has:

(1)    occurred or will occur on premises;

(2)    been caused or will be caused by any **Employee**; or

(3)    arisen or will arise out of the assets or liabilities,

of such institution, unless the **Insured**:

(I)    gives the **Underwriter** written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities within 90 days of the proposed effective date of such action;

(II)    obtains the written consent of the **Underwriter** to extend some or all of the coverage provided by this Bond to such additional exposure; and

(III)    on obtaining such consent, pays to the **Underwriter** an additional premium.

(B)    Notwithstanding (A) above, if, during the **Policy Period**, the **Insured** acquires more than 50% of the voting stock or voting rights of an institution (either directly or indirectly through one or more subsidiaries), this Bond will cover such institution, as of the effective date of such acquisition, for the remainder of the **Policy Period** for no additional premium, provided that:

(1)    the assets of such institution do not exceed 25% of the **Insured's** assets as of inception of the **Policy Period**;

(2)    there are no paid nor pending bond claims for the three-year period prior to the date of acquisition; and

(3)    as of the date of acquisition, the **Insured** is not aware of any disciplinary action or proceeding by any State or Federal official involving such institution.

If the **Insured's** acquisition of an institution involves a State or Federal regulatory assisted acquisition or assumption of assets and/or liabilities, this Bond will cover such institution, as of the effective date of such acquisition or assumption, for the remainder of the **Policy Period** as long as the conditions set forth in (1) and (2) above are met.

(C)    Coverage with respect to any acquired institution or assumed assets or liabilities shall apply only to a Single Loss fully sustained by the **Insured** on or after the effective date of such acquisition or assumption. Accordingly, for coverage to apply, all of the circumstances, conditions or acts causing or contributing to a Single Loss must occur on or after such date, regardless of the date such loss is discovered by the **Insured**.

(D)    If the **Insured's** merger or consolidation with another institution, creation of an institution, or purchase or acquisition of assets or liabilities results in a significant increase in the **Insured's** proprietary trading activities, the **Insured** shall provide the **Underwriter** with any underwriting

information requested and will accept any reasonable coverage modifications and premium adjustments which the **Underwriter** may require.

## BOND TABLE

| Insuring Agreement: | Single Loss Limit of Liability: | Deductible Amount: |
|---|---|---|
| (A)  DISHONESTY OF **EMPLOYEES** | $25,000,000 | $25,000,000 |
| (B)  ON PREMISES BURGLARY, ROBBERY, MISPLACEMENT, ETC. | $25,000,000 | $25,000,000 |
| (C)  IN TRANSIT | $25,000,000 | $25,000,000 |
| (D)  **FORGERY** OR ALTERATION | $25,000,000 | $25,000,000 |
| (E)  **FORGERY** OR ALTERATION OF SECURITIES, ETC. | $25,000,000 | $25,000,000 |
| (F)  BROAD FORM EXTORTION | $25,000,000 | $25,000,000 |
| (G)  **COUNTERFEIT** CURRENCY | $25,000,000 | $25,000,000 |
| (H)  CLAIMS EXPENSE | $25,000,000 | $25,000,000 |
| (I)  INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR **EMPLOYEES** | $25,000,000 | $25,000,000 |
| (J)  **UNATTENDED AUTOMATED MECHANICAL DEVICES** | $25,000,000 | $25,000,000 |
| (K)  **TRANSIT CASH LETTERS** | $25,000,000 | $25,000,000 |
| (L)  SAFE DEPOSIT BOX | $25,000,000 | $25,000,000 |
| (M)  REAL PROPERTY MORTGAGES – DEFECTIVE SIGNATURES | $25,000,000 | $25,000,000 |
| (N)  LIABILITY TO CUSTOMER ON STOP PAYMENT ORDERS OR WRONGFUL DISHONOR OF CHECKS | $25,000,000 | $25,000,000 |
| (O)  **SERVICING CONTRACTORS** | $25,000,000 | $25,000,000 |
| (P)  FACSIMILE SIGNATURE | $25,000,000 | $25,000,000 |
| (Q)  UNAUTHORIZED SIGNATURE AND ENDORSEMENT | $25,000,000 | $25,000,000 |

ENDORSEMENT NUMBER: 1

**WAIVER OF REPORTING REQUIREMENTS WITH
RESPECT TO ACQUISITION OF SPECIFIC SUBSIDIARY**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the **Underwriter** hereby waives the reporting
requirements set fort in:

(1)    subsection (ii) of Section 5(A) (Acquisition or Creation of Organizations) of the General Terms
        and Conditions; and

(2)    Section 13 (CHANGES IN EXPOSURE) of Coverage Section D. Financial Institution Bond;

with respect to the acquisition of National City Corporation effective at 11:00 A.M. E.S.T. on December
31, 2008.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

8300-1001                              Page 1 of 1
Ed. 04/09

ENDORSEMENT NUMBER: 2

**FINANCIAL INSTITUTION ELECTRONIC AND COMPUTER CRIME
COVERAGE ENDORSEMENT (COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the following amendments are made to Coverage
Section D. Financial Institution Bond:

(1)    The following Insuring Agreements are added under Section 1:

    (R)    **COMPUTER SYSTEMS**:  Loss resulting directly from the **Insured** having
transferred, paid or delivered any funds or property, established any credit, debited
any account or given value as the direct result of the fraudulent preparation or the
fraudulent modification of **Electronic Instruction** or the fraudulent input of
**Electronic Data** directly into:

        (1)    the **Insured's Computer System**;

        (2)    a **Service Bureau's Computer System**;

        (3)    an **Electronic Funds Transfer System**; or

        (4)    a **Customer Communication System**.

    (S)    **ELECTRONIC    DATA,    ELECTRONIC    MEDIA,    ELECTRONIC
INSTRUCTION**:  Loss resulting directly from:

        (1)    the fraudulent modification of **Electronic Data, Electronic Media** or
**Electronic Instruction** being stored within or being run within any system
covered under Insuring Agreement (R);

        (2)    robbery, burglary, larceny or theft of **Electronic Data, Electronic Media** or
**Electronic Instruction**;

        (3)    the acts of a hacker causing damage to or destruction of **Electronic Data,
Electronic Media** or **Electronic Instruction** owned by the **Insured** or for
which the **Insured** is legally liable, while stored within a **Computer
System** covered under Insuring Agreement (R); or

        (4)    the damage to or destruction of **Electronic Data, Electronic Media** or
**Electronic Instruction** owned by the **Insured** or for which the **Insured** is
legally liable, while stored within a **Computer System** covered under
Insuring Agreement (R), provided such damage or destruction was caused
by a computer program or similar instruction which was written or altered
to intentionally incorporate a hidden instruction designed to damage or
destroy **Electronic Data, Electronic Media** or **Electronic Instruction** in
the **Computer System** in which the computer program or instruction so
written or so altered is used.

    (T)    ELECTRONIC COMMUNICATION:  Loss resulting directly from the **Insured**
having transferred, paid or delivered any funds or property, established any credit,
debited any account or given any value on the faith of any electronic
communications directed to the **Insured**, which were transmitted or appear to have
been transmitted through:

        (1)    an **Electronic Communication System**;

(2)    an automated clearing house or custodian; or

(3)    a telex, TWX, **Telefacsimile** instruction or similar means of communication;

directly into the **Insured's Computer System** or **Communication Terminal**, and fraudulently purport to have been sent by a customer, automated clearing house, custodian or financial institution, but which communications were either not sent by said customer, automated clearing house, custodian or financial institution, or were fraudulently modified during physical transit of **Electronic Media** to the **Insured** or during electronic transmission to the **Insured's Computer System** or **Communication Terminal**.

(U)    **INSURED'S SERVICE BUREAU** OPERATION: Loss resulting directly from a customer of the **Insured** having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value as the direct result of the fraudulent input, the fraudulent modification or the fraudulent destruction of **Electronic Data** stored within, or being run within, the **Insured's Computer System**, or during electronic transmission through data communication lines from the **Insured's Computer System** into the customer's **Computer System**, while the **Insured** is acting as a **Service Bureau** for said customer, which fraudulent acts were committed by a person who intended to cause the **Insured** or the **Insured's** customer to sustain a loss or to obtain financial gain for such person or any other person, and for which loss the **Insured** is held to be legally liable.

(V)    ELECTRONIC TRANSMISSIONS: Loss resulting directly from a customer of the **Insured**, any automated clearing house or custodian, or financial institution having transferred, paid or delivered any funds or property, established any credit, debited any account or given any value on the faith of any electronic communications, purporting to have been directed by the **Insured** to such customer, automated clearing house, custodian or financial institution initiating, authorizing or acknowledging the transfer, payment, delivery or receipt of funds or property, which were transmitted or appear to have been transmitted through:

(1)    an **Electronic Communication System**;

(2)    an automated clearing house or custodian; or

(3)    a telex, TWX, **Telefacsimile** instruction or similar means of communication;

directly into a **Computer System** or **Communication Terminal** of said customer, automated clearing house, custodian or financial institution, and fraudulently purport to have been sent by the **Insured**, but which communications were either not sent by the **Insured**, or were fraudulently modified during electronic transmission from the **Insured's Computer System** or **Communication Terminal**, and for which loss the **Insured** is held to be legally liable.

(W)    CUSTOMER VOICE INITIATED TRANSFER: Loss resulting directly from the **Insured** having transferred any funds on the faith of any **Voice Initiated Funds Transfer Instruction** made by a person purporting to be:

(1)    a **VIT Customer**;

(2)    an authorized representative of the **VIT Customer**; or

(3)    an **Employee** who was authorized by the **Insured** to instruct other **Employees** to transfer funds;

provided such instructions were received by an **Employee** specifically designated to receive and act upon such instructions, and such acts were committed by said person

described above for the purpose of making an improper personal financial gain for such natural person or entity or any other natural person or entity.

(X)     **COMPUTER SYSTEM** EXTORTION:  Loss resulting directly from the **Insured** having surrendered any funds or **Property** to a person other than an **Employee** of the **Insured** where said person has gained or alleges to have gained unauthorized access to the **Insured's Computer System** and threatens to:

(1)     cause the **Insured** to transfer, pay or deliver any funds or **Property** using the **Insured's Computer System**;

(2)     sell or disclose confidential security codes to another person or party to enable the recipient of such confidential security codes to cause the **Insured** to transfer, pay or deliver any funds or **Property** using the **Insured's Computer System**; or

(3)     damage or destroy the **Insured's Electronic Data** or **Electronic Instruction** while stored within the **Insured's Computer System**;

provided that before surrendering any funds or **Property**, the **Insured** shall have made every reasonable effort to conduct an investigation which provides a reasonable basis for concluding such threat is technologically credible, and the **Insured** reports such threat to the Federal Bureau of Investigation or other law enforcement agency having jurisdiction over such matters and reasonably complies with the recommendations, instructions or suggestions of such law enforcement agency.

(2)     The following Definitions are added under Section 3:

(KK)     **Communication Terminal** means a teletype, teleprinter or video display terminal, or similar device capable of sending or receiving information electronically. **Communication Terminal** does not mean a telephone.

(LL)     **Computer System** means a computer and all input, output, processing, storage, off-line media libraries, and communication facilities which are connected to the computer and which are under the control or supervision of the operating system(s) or application(s) software used by the **Insured**.

(MM)     **Customer Communication System** means those communications systems which provide customers of the **Insured** with direct access to the **Insured's Computer Systems**.

(NN)     **Electronic Communication System** means electronic communication operations by Fedwire, Clearing House Interbank Payment System (CHIPS), Society of Worldwide International Financial Telecommunication (SWIFT), similar automated interbank communication systems, and internet access facilities.

(OO)     **Electronic Data** means facts or information converted to a form usable in **Computer Systems** and stored on **Electronic Media** for use by computer programs.

(PP)     **Electronic Funds Transfer System** means automated teller machines, point-of-sale terminals and other similar operating systems, and includes any shared networks, internet access facilities or other similar facilities for such systems, in which the **Insured** participates.

(QQ)     **Electronic Instruction** means computer programs converted to a form usable in a **Computer System** to act upon **Electronic Data**.

(RR)    **Electronic Media** means the magnetic tape, magnetic disk, optical disk or any other bulk media on which data is recorded.

(SS)    **Service Bureau** means a natural person, partnership or corporation authorized by written agreement to perform data processing services using **Computer Systems**. This Bond terminates as to any **Service Bureau** immediately upon the **Insured** or any of its directors or officers (not acting in collusion with such **Service Bureau**) learning of any dishonest act committed by such **Service Bureau** or its employees at any time against the **Insured** or any other **Service Bureau** or entity.

(TT)    **Service Bureau's Computer System** means those **Computer Systems** owned, leased or operated by a **Service Bureau**.

(UU)    **Telefacsimile** means a system of transmitting written documents by electronic signals over telephone lines to equipment maintained by the **Insured** for the purpose of reproducing a copy of said document. **Telefacsimile** does not mean electronic communication sent by telex or similar means of communication, or through an **Electronic Communication System** or through an automated clearing house.

(VV)    **VIT Customer** means any corporation, partnership, proprietor, trust or natural person having an account with the **Insured** and having a written agreement with the **Insured** for customer voice initiated funds transfers.

(WW)    **Voice Initiated Funds Transfer Instruction** means those oral instructions authorizing the transfer of funds in a **VIT Customer's** account to a financial institution for credit to accounts designated by the **VIT Customer**:

(1)    made over the telephone;

(2)    directed to those **Employees** specifically authorized by the **Insured** to receive such instructions by telephone at the **Insured's** offices; and

(3)    by the **VIT Customer** or a natural person authorized and appointed by the **VIT Customer** to request by telephone the transfer of such funds.

For the purposes of these Definitions, the singular includes the plural and the plural includes the singular, unless otherwise indicated.

(3)    Solely with respect to Insuring Agreements (R) through (X), Section 4 is deleted and replaced with the following:

4.    **EXCLUSIONS**

This Bond does not directly or indirectly cover:

(A)    loss not reported to the **Underwriter** in writing within 60 days after termination of this Bond as an entirety;

(B)    loss due to riot or civil commotion outside the United States of America, Canada or any country where the **Insured** premises are located or any loss due to military, naval or usurped power, war or insurrection, unless:

(1)    such loss occurs in transit in the circumstances recited in Insuring Agreement (C); and

(2)    when such transit was initiated, there was no knowledge on the part of any person acting for the **Insured** of such riot, civil commotion, military, naval or usurped power, war or insurrection;

(C)    loss covered under Insuring Agreements (A) through (Q) or caused by an **Employee** of the **Insured** or caused by anyone authorized to access **Computer Systems**;

(D)    loss resulting from the effects of nuclear fission or fusion or radioactivity;

(E)    loss of potential income, including but not limited to interest and dividends not realized by the **Insured** or by any customer of the **Insured**;

(F)    loss resulting from an indirect or consequential loss of any nature,

(G)    damages of any type for which the **Insured** is legally liable, except compensatory damages (but not multiples thereof) arising from a loss covered under this Bond;

(H)    any costs, fees and expenses incurred by the **Insured** in establishing the existence of or amount of loss covered under this Bond, except to the extent covered under Insuring Agreement (H);

(I)    loss of any confidential information, material or data;

(J)    liability assumed by the **Insured** by agreement under any contract, unless such liability would have attached to the **Insured** even in the absence of such agreement;

(K)    loss of **Electronic Data**, **Electronic Media** or **Electronic Instruction** while in the mail;

(L)    loss resulting directly or indirectly from:

    (1)    written instruction or advice;

    (2)    telegraphic or cable instruction or advice; or

    (3)    instruction or advice by voice over the telephone, unless covered under Insuring Agreement (W);

(M)    loss resulting directly or indirectly from forged, altered or fraudulent **Negotiable Instruments**, securities, documents or written instruments used as source documentation in the preparation of **Electronic Data**;

(N)    loss of **Negotiable Instruments**, securities, documents or written instruments, except as converted to **Electronic Data** and then only in that converted form;

(O)    loss through the surrender of **Property** away from premises of the **Insured** as a result of a threat:

    (1)    to do bodily harm to any natural person, except loss of **Electronic Media** or **Electronic Data** in transit under Insuring Agreement (C) in the custody of any natural person acting as a messenger of the **Insured**, provided that when such transit was initiated, there was no knowledge by the **Insured** of any such threat; or

    (2)    to do damage to the premises or **Property** of the **Insured**, unless covered under Insuring Agreement (X);

(P)    loss resulting from mechanical failure, faulty construction, error in design, latent defect, wear, tear, gradual deterioration, electrical disturbance, **Electronic Media** failure or breakdown or any malfunction or error in programming or errors in processing; or

(Q)    loss resulting directly or indirectly from the input of **Electronic Data** at an authorized electronic terminal of an **Electronic Funds Transfer System** or a **Customer Communication System** by a customer or other person who had authorized access to the customer's authentication mechanism.

(4)    Solely with respect to Insuring Agreements (R) through (X), subsections (1) through (4) under Section (6)(B) (SINGLE LOSS LIMIT OF LIABILITY) are deleted and replaced with the following:

(1)    any one act of burglary, robbery or attempt at either, in which no **Employee** is implicated;

(2)    any one act or series of related acts on the part of any natural person resulting in damage to or destruction of **Electronic Data**, **Electronic Media** or **Electronic Instruction**;

(3)    all acts, other than those specified in (1) or (2) above, caused by any natural person or in which such person is implicated; or

(4)    any one event not specified in (1), (2) or (3) above.

(5)    The following subsection is added under Section 8 (VALUATION):

(F)    **ELECTRONIC DATA, ELECTRONIC MEDIA** OR **ELECTRONIC INSTRUCTION**

In case of loss of, or damage to, **Electronic Data**, **Electronic Media** or **Electronic Instruction** used by the **Insured** in its business, the **Underwriter** shall be liable under this Bond only if such items are actually reproduced from other **Electronic Data**, **Electronic Media** or **Electronic Instruction** of the same kind of quality, and then for not more than the cost of the blank media and/or the cost of labor for the actual transcription or copying of data which shall have been furnished by the **Insured** in order to reproduce such **Electronic Data**, **Electronic Media** or **Electronic Instruction**. If, however, such **Electronic Data** cannot be reproduced and said **Electronic Data** represents securities or financial instruments having a value, then the loss will be valued as indicated in subsections (A) or (C) above.

(6)    The following entries are added to the Bond Table:

| Insuring Agreement: | Single Loss Limit of Liability: | Deductible Amount: |
| --- | --- | --- |
| (R) **COMPUTER SYSTEMS** | $25,000,000 | $25,000,000 |
| (S) **ELECTRONIC DATA, ELECTRONIC MEDIA, ELECTRONIC INSTRUCTION** | $25,000,000 | $25,000,000 |
| (T) ELECTRONIC COMMUNICATION | $25,000,000 | $25,000,000 |
| (U) **INSURED'S SERVICE BUREAU** OPERATION | $25,000,000 | $25,000,000 |
| (V) ELECTRONIC TRANSMISSIONS | $25,000,000 | $25,000,000 |
| (W) CUSTOMER VOICE INITIATED TRANSFER | $25,000,000 | $25,000,000 |

| Insuring Agreement: | Single Loss Limit of Liability: | Deductible Amount: |
|---|---|---|
| (X) **COMPUTER SYSTEM** EXTORTION | $25,000,000 | $25,000,000 |

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
            Attorney-in-Fact

ENDORSEMENT NUMBER: 3

**SPECIFIC ENTITY EXCLUSION
(COVERAGE SECTION B)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that:

(1)     Definition (H) **Insured(s)** of Coverage Section B. Financial Institution Professional Liability shall not include Blackrock, Inc., or any **Subsidiary** thereof.

(2)     The following Exclusion is added under Section 5 of Coverage Section B. Financial Institution Professional Liability:

(J)     by, on behalf of, at the direction of or in the name or right of Blackrock, Inc., or any **Subsidiary** thereof; provided, that this Exclusion (J) shall apply only to **Wrongful Acts** taking place prior to September 29, 2006.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                 Attorney-in-Fact

ENDORSEMENT NUMBER:  4

**AMEND DEFINITION OF COMPANY**
**(COVERAGE SECTION A)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that Definition (C) **Company** of Coverage Section A.
Company Liability (D&O) is amended to include the following entities:

(i)      Bipartisan Voluntary Public Affairs Committee of PNC Bank N.A. (aka PNCBANKPAC);

(ii)     Federal Bipartisan Voluntary Public Affairs Committee of PNC Bank N.A.;

(iii)    PNCBANKPAC – Delaware;

(iv)     PNCBANKPAC – New Jersey;

(v)      Mercantile Bankshares Corporation State PAC;

(vi)     PNC Foundation; and

(vii)    PNC Memorial Foundation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
                        Attorney-in-Fact

8300-1003                           Page 1 of 1
Ed. 04/09

ENDORSEMENT NUMBER:  5

**ENTITY SECURITIES COVERAGE ENDORSEMENT**
**(COVERAGE SECTION A)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the following amendments are made to Coverage
Section A. Company Liability (D&O):

(1)     Section 1 is deleted and replaced with the following:

     **1.**    **INSURING AGREEMENTS**

     (A)    The **Underwriter** will pay on behalf of the **Company** all **Loss** for which the **Company**
has, to the extent permitted or required by law, indemnified the **Directors and Officers**
as a result of a **Claim** first made against them during the **Policy Period** or, if applicable,
the **Discovery Period**, for a **Wrongful Act** which takes place during or prior to the
**Policy Period**; provided, however, the **Insureds** shall report such **Claim** to the
**Underwriter** as soon as practicable, but in no event later than 90 days after termination
of the **Policy Period** or, if applicable, the **Discovery Period**.

     (B)    The **Underwriter** will pay on behalf of the **Company** all **Loss** which the **Company** is
legally liable to pay as a result of a **Securities Claim** first made against the **Company**
during the **Policy Period** or, if applicable, the **Discovery Period**, for a **Company**
**Wrongful Act** which takes place during or prior to the **Policy Period**; provided,
however, the **Insureds** shall report such **Securities Claim** to the **Underwriter** as soon as
practicable, but in no event later than 90 days after termination of the **Policy Period** or, if
applicable, the **Discovery Period**.

(2)     The following Definition is added under Section 3:

     (V)    **Company Wrongful Act** means, with respect only to **Securities Claims**, any actual
or alleged act, error, omission, neglect, misstatement, misleading statement or breach
of duty by the **Company**.

(3)     The first sentence of Definition (I) **Loss** is deleted and replaced with the following:

     **Loss** means the total amount which:

     (i)    the **Directors and Officers** are legally liable to pay as result of any **Claims**, and

     (ii)    the **Company** is legally liable to pay as a result of any **Securities Claims**,

     including **Claims Expenses**, damages, judgments, settlement amounts, and any award of pre-
and post judgment interest, attorneys' fees and costs.

(4)     The following sentence is added to Definition (U) **Wrongful Act**:

     The term **Wrongful Act** also means any **Company Wrongful Act**.

(5)     The following Exclusion is added under Section 4:

     (J)    that is a **Securities Claim** against the **Company** and arises out of any actual or
alleged liability of the **Company** under any express contract or agreement (for
purposes of the foregoing, "express contract or agreement" means an actual
agreement of the parties, the terms of which are openly set forth or declared at the

8300-1004                                   Page 1 of 2
Ed. 04/09

time of making in clear or distinct language); provided, that this Exclusion (J) shall not apply to the extent the **Company** would have been liable in the absence of such express contract or agreement.

(6)    The following sentence is added at the end of Section 6 (REPRESENTATIONS AND SEVERABILITY):

        With respect to Insuring Agreement (B) of this Coverage Section, only acts or omissions pertaining to, and knowledge possessed by, the Chief Executive Officer or Chief Financial Officer of the **Parent Company** employed at the time such statements were made to the **Underwriter** may be imputed to the **Company**.

(7)    The amount set forth in ITEM C of the Declarations shall continue to be the **Underwriter's** maximum aggregate Limit of Liability under this Policy, and the amount set forth in ITEM D of the Declarations shall apply to **Loss** from a **Securities Claim** against the **Company**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

    Effective date of this endorsement:

        By:_____
                           Attorney-in-Fact

ENDORSEMENT NUMBER: 6

## INVESTMENT BANKING ENDORSEMENT
## (COVERAGE SECTION B)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the following amendments are made to Coverage Section B. Financial Institution Professional Liability:

(1)     The following Definitions are added under Section 4:

    (W)     **Investment Banking Claim** means a **Claim** based upon, arising from, in consequence of or in any way involving the performance of or failure to perform **Investment Banking Services**.

    (X)     **Investment Banking Services** means any investment banking or related activities, including without limitation:

        (1)     the performance of or failure to perform any **Professional Services** by or on behalf of PNC Capital Markets or its natural person **Insureds**;

        (2)     the performance of or failure to perform any **Professional Services** by or on behalf of Harris Williams & Co. or its natural person **Insureds**;

        (3)     the underwriting, placement, securitizing, syndicating, promoting, conversion, sale, purchase or market making (as defined in section 3(A)(38) of the Securities Exchange Act of 1934, as amended) of any security or instrument or other evidence of indebtedness, whether or not registered under the Securities Act of 1933, as amended;

        (4)     the rendering of advice or recommendations regarding any actual, potential, attempted or threatened merger, consolidation, business combination, acquisition, divestiture, distribution, tender or exchange offer, proxy contest or solicitation, leveraged or management buy-out, going private transaction, partnership, minority investment, joint or collaborative venture, dissolution, liquidation, rehabilitation, spin-off, primary or secondary private or public offering of debt or equity securities or other instruments or evidences of indebtedness, or sale of assets or operations of any enterprise or entity, or any effort to raise or furnish capital or financing for any enterprise or entity;

        (5)     the rendering of analysis, advice or fairness opinions or valuations regarding any enterprise or entity or any of the assets or liabilities of, or interests in, any entity not held by the **Insured** as trustee;

        (6)     any acquisition, sale, conversion or transfer of securities, assets or liabilities by the **Insured** for such **Insured's** own account or as an original purchaser in a transaction under Regulation 144A under the Securities Act of 1933, as amended;

        (7)     forming, syndicating, operating, administering, advising or rolling up a limited partnership or real estate investment trust; or

        (8)     any disclosure or statement or omission in any disclosure or filing in connection with any of the foregoing.

**Investment Banking Services** shall not include:

         (I)      the **Insured's** activities of managing securities portfolios, giving financial advice, or investment management services relating to or in connection with the investing in securities of entities which are not involved with any of the foregoing investment banking activities; or

         (II)     any extension of or refusal to extend credit or granting or refusing to grant a loan or similar lending transaction to any entity which is involved in any of the foregoing investment banking activities.

(2)     The retention applicable to **Loss** from an **Investment Banking Claim** shall be $50,000,000 (and ITEM D of the Declarations shall be deemed amended accordingly).

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

     Effective date of this endorsement:

                 By:_____
                            Attorney-in-Fact

ENDORSEMENT NUMBER: 7

**LIMITED ADDITIONAL INSURED**
**(COVERAGE SECTION B)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that Definition (H) **Insured(s)** of Coverage Section B. Financial Institution Professional Liability is amended to include ISU Employer Services, Inc. ("Limited Additional Insured"), but only with respect to **Claims** made against the Limited Additional Insured alleging vicarious liability for **Wrongful Acts** by an **Insured** other than such Limited Additional Insured; moreover, the **Underwriter** shall not be liable to make any payment of **Loss** on account of any **Claims** alleging or in any way involving any independent act, error or omission by the Limited Additional Insured.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                Attorney-in-Fact

8300-1006
Ed. 04/09

ENDORSEMENT NUMBER:  8

**SERVICE OF SUIT**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the **Underwriter** hereby designates the Commissioner, Superintendent or Director of Insurance or other officer specified for such purpose in the statute, and his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted in any court of competent jurisdiction by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designates The Claims Manager, HCC Global Financial Products LLC, P.O. Box 4018, Farmington, CT  06034, as the entity to whom said officer is authorized to mail such process or a true copy thereof.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                        Attorney-in-Fact

ENDORSEMENT NUMBER: 9

## LOSS PAYEE ENDORSEMENT – FANNIE MAE AND FREDDIE MAC
## (COVERAGE SECTION B)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section B. Financial Institution Professional Liability:

(1)     If a **Claim** against the **Insured** also includes a **Claim** against Fannie Mae or Freddie Mac solely by reason of Fannie Mae or Freddie Mac's ownership interest in property or assets which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured**, all **Loss** which Fannie Mae or Freddie Mac becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Insured** becomes legally obligated to pay as a result of such **Claim**. All limitations, conditions, provisions and other terms of coverage applicable to the **Insured** shall also be applicable to Fannie Mae and Freddie Mac. This coverage extension shall not apply to the extent the **Claim** alleges any act, error or omission by Fannie Mae or Freddie Mac. Any payment due by virtue of this extension shall be made by an instrument issued (as to their respective interests) to the **Insured** and Fannie Mae or Freddie Mac (or its successors and assigns) as joint loss payees.

(2)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to: (i) give Fannie Mae or Freddie Mac any rights under this Policy, (ii) include Fannie Mae or Freddie Mac as an **Insured** under this Policy, or (iii) afford Fannie Mae or Freddie Mac any rights as a third-party beneficiary of this Policy.

(3)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall remain the **Underwriter's** aggregate limit for all amounts payable under this Policy. In no event shall any failure to make payment as described in paragraph (1) above serve to increase such Limit of Liability.

(4)     If the **Underwriter** cancels or non-renews Coverage Section B, or if it reduces or restrictively modifies the coverage provided by Coverage Section B, the **Underwriter** will endeavor to give thirty (30) business days advance notice to Fannie Mae and Freddie Mac of such action, but the failure to do so shall not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor shall the **Underwriter** be held liable in any way by the **Insured**, Fannie Mae, Freddie Mac or any other party for failure to provide such notification.

(5)     If the **Insured** requests to reduce the coverage provided by Coverage Section B, the **Underwriter** will endeavor to notify Fannie Mae and Freddie Mac of such request within ten (10) business days of receipt of such request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor shall the **Underwriter** be held liable in any way by the **Insured**, Fannie Mae, Freddie Mac or any other party for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

     Effective date of this endorsement:

                By:_____
                            Attorney-in-Fact

ENDORSEMENT NUMBER: 10

## LOSS PAYEE ENDORSEMENT – FANNIE MAE AND FREDDIE MAC
### (COVERAGE SECTION D)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial Institution Bond:

(1)     Upon written request to the **Underwriter** by the corporate insurance/risk management director of the **Insured**, any payment in satisfaction of loss covered by Coverage Section D involving property in which Fannie Mae or Freddie Mac has an interest shall be made by an instrument issued (as to their respective interests) to the **Insured** and Fannie Mae or Freddie Mac as joint loss payees.

(2)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to: (i) give Fannie Mae or Freddie Mac any rights under this Policy, (ii) include Fannie Mae or Freddie Mac as an **Insured** under this Policy, or (iii) afford Fannie Mae or Freddie Mac any rights as a third-party beneficiary of this Policy.

(3)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall remain the **Underwriter's** aggregate limit for all amounts payable under this Policy. In no event shall any failure to make payment as described in paragraph (1) above serve to increase such Limit of Liability.

(4)     If the **Underwriter** cancels or non-renews Coverage Section D, or if it reduces or restrictively modifies the coverage provided by Coverage Section D, the **Underwriter** will endeavor to give thirty (30) business days advance notice to Fannie Mae and Freddie Mac of such action, but the failure to do so shall not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor shall the **Underwriter** be held liable in any way by the **Insured**, Fannie Mae, Freddie Mac or any other party for failure to provide such notification.

(5)     If the **Insured** requests to reduce the coverage provided by Coverage Section D, the **Underwriter** will endeavor to notify Fannie Mae and Freddie Mac of such request within ten (10) business days of receipt of such request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor shall the **Underwriter** be held liable in any way by the **Insured**, Fannie Mae, Freddie Mac or any other party for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
           Attorney-in-Fact

8300-1009                              Page 1 of 1
Ed. 06/09

ENDORSEMENT NUMBER: 11

**SPECIAL RETENTION ENDORSEMENT**
**(COVERAGE SECTION B)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, solely with respect to Coverage Section B. Financial Institution Professional Liability, in the event of **Loss** on account of a **Claim** arising out of mortgage-backed securities which are serviced for or have been sold to or purchased by the Government National Mortgage Association, Fannie Mae or Freddie Mac and/or any other Mortgage Services Investors that have an interest, the **Underwriter** shall be liable only for the amount by which such **Loss** exceeds a retention of five million dollars ($5,000,000), and ITEM D of the Declarations shall be deemed amended accordingly.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                Attorney-in-Fact

ENDORSEMENT NUMBER: 12

**SPECIAL DEDUCTIBLE ENDORSEMENT**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, solely with respect to Coverage Section D. Financial Institution Bond:

(1)    In the event of any loss under any Insuring Agreement arising out of mortgage-backed securities which are serviced for or have been sold to or purchased by the Government National Mortgage Association, Fannie Mae, Freddie Mac, MGIC Mortgage Corporation, UNUM Life Insurance Underwriter of America and/or any other Mortgage Services Investors that have an interest, the **Underwriter** shall be liable only for the amount by which any Single Loss exceeds a Deductible Amount of one hundred thousand dollars ($100,000), and ITEM D of the Declarations and the Bond Table shall be deemed amended accordingly.

(2)    In the event of any loss under any Insuring Agreement arising out of the following **Insureds'** business with the National Association of Securities Dealers, Inc. and Securities Investor Protection Corporation, the **Underwriter** shall be liable only for the amount by which any Single Loss exceeds a Deductible Amount of five thousand dollars ($5,000), and ITEM D of the Declarations and the Bond Table shall be deemed amended accordingly:

> National City Investment Underwriter
> NatCity Investments, Inc.
> NatCity Insurance Services, Inc.
> National City Investment Management Underwriter
> Sterling Private Investments, Inc.
> Allegiant Investment Counselors, Inc.
> Red Capital Markets, Inc.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
        Attorney-in-Fact

ENDORSEMENT NUMBER: 13

**ERISA ENDORSEMENT**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial Institution Bond:

(1)     Definition (H) **Employee** will include: (i) any natural person who is a director, fiduciary or trustee of the **Insured** while such director, fiduciary or trustee is engaged in handling funds or other property of any Employee Welfare or Pension Benefit Plan owned, controlled or operated by the **Insured**; and (ii) any natural person who is a fiduciary, trustee, manager, officer or employee of any such Plan.

(2)     If this Bond, in accordance with its agreements, limitations and conditions, covers loss sustained y two or more Employee Welfare or Pension Benefit Plans or loss sustained by any such Plan in addition to loss sustained by an **Insured** other than such Plan, it is the obligation of the **Insured** or the Plan Administrator(s) of such Plans under Regulations published by the Secretary of Labor implementing Section 13 of the Welfare and Pension Plans Disclosure Act of 1958 to obtain under one or more bonds issued by one or more insurers an amount of coverage for each such Plan at least equal to that which would be required if such Plans were bonded separately.

(3)     In compliance with the foregoing, payment by the **Underwriter** in accordance with the agreements, limitations and conditions of this Bond shall be held by the first named **Insured** for the use and benefit of any Employee Welfare or Pension Benefit Plan sustaining loss so covered. To the extent such payment is in excess of the amount of coverage required by such Regulations to be carried by said Plan sustaining such loss, such excess shall be held for the use and benefit of any other such Plan in the event such other Plan discovers it has sustained loss covered under this Bond.

(4)     If money or other property of two or more Employee Welfare or Pension Benefit Plans covered under this Bond is commingled, recovery for loss of such money or other property through fraudulent or dishonest acts of **Employees** shall be shared by such Plans on a pro-rata basis in accordance with the amount for which each such Plan is required to carry bonding coverage in accordance with the applicable provisions of said Regulations.

(5).     The Deductible Amount applicable to loss sustained by a Plan through acts committed by an **Employee** of the Plan shall be waived under this Bond, but only up to an amount equal to the amount of coverage required to be carried by the Plan because of compliance with the provisions of the Employee Retirement Income Security Act of 1974.

(6)     The non-banking subsidiaries of the **Insured** or its subsidiaries shall be included as **Insureds** with respect to their duties as third party investment advisors for Employee Welfare and Pension Benefit Plans that are required to be bonded under the Employee Retirement Income Security Act of 1974.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

ENDORSEMENT NUMBER:  14

**DEPOSITORY ENDORSEMENT
(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial
Institution Bond:

(1)     Those premises of Depositories at any location of the **Insured** shall be deemed to be premises of
the **Insured** but only as respects coverage on **Certificated Securities**.

(2)     **Certificated Securities** held by such Depository shall be deemed to be **Property** as defined in this
Bond to the extent of the **Insured's** interest therein, as effected by the making of appropriate
entries on the books and records of such Depository.

(3)     This Bond does not afford coverage in favor of any Depository at any location of the **Insured**.  If
the **Underwriter** indemnifies the **Insured** for a loss covered pursuant to this endorsement, the
**Insured** will assign to the **Underwriter** the rights and causes of action to the extent of the claim
payment against the Depository or any other entity or person against whom it has a cause of
action.

(4)     If the rules of the Depository at any location of the **Insured** provide that the **Insured** shall be
assessed for a portion of the judgment (or agreed settlement) taken by the **Underwriter** based
upon the assignment described in paragraph (3) above and the **Insured** actually pays such
assessment, then the **Underwriter** will reimburse the **Insured** for the amount of the assessment
but not exceeding the amount of the loss payment by the **Underwriter**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
Attorney-in-Fact

8300-1013                                    Page 1 of 1
Ed. 04/09

ENDORSEMENT NUMBER: 15

**SPECIAL CANCELLATION ENDORSEMENT –**
**ARKANSAS SECURITIES DEPARTMENT**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the following paragraph is added to Section 11
(TERMINATION OR CANCELLATION) of Coverage Section D. Financial Institution Bond:

> No cancellation or termination of this Bond as an entirety, whether by or at the request of the
> **Insured** or the **Underwriter**, shall take effect prior to the expiration of 30 days after written
> notice of such cancellation or termination has been filed with the Commissioner, Arkansas
> Securities Department, Heritage West Building, Suite 300, 201 East Markham Street, Little Rock,
> AR 72201, unless an earlier date for such cancellation or termination is approved by the Arkansas
> Securities Department.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 16

## SPECIAL CANCELLATION ENDORSEMENT – FINRA
### (COVERAGE SECTION D)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the following paragraph is added to Section 11 (TERMINATION OR CANCELLATION) of Coverage Section D. Financial Institution Bond:

> No cancellation or termination of this Bond as an entirety, whether by or at the request of the **Insured** or the **Underwriter**, shall take effect prior to the expiration of 30 days after written notice of such cancellation or termination has been filed with the Financial Industry Regulatory Authority, Inc. (FINRA), unless an earlier date for such cancellation or termination is approved by FINRA.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
          Attorney-in-Fact

ENDORSEMENT NUMBER: 17

**SPECIAL CANCELLATION ENDORSEMENT –**
**NEW JERSEY DIVISION OF BANKING**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that the following paragraph is added to Section 11
(TERMINATION OR CANCELLATION) of Coverage Section D. Financial Institution Bond:

No cancellation or termination of this Bond as an entirety, whether by or at the request of the
**Insured** or the **Underwriter**, shall take effect prior to the expiration of five days after written
notice of such cancellation or termination has been filed with the Division of Banking of the State
of New Jersey, P.O. Box 040, Trenton, NJ 08625.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

8300-1016                                   Page 1 of 1
Ed. 04/09

ENDORSEMENT NUMBER:  18

## LOSS PAYEE ENDORSEMENT – GOVERNMENT NATIONAL MORTGAGE ASSOCIATION (COVERAGE SECTION D)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial Institution Bond:

(1)    Upon written request to the **Underwriter** by the corporate insurance/risk management director of the **Insured**, and in the event of a loss affecting the interest of the Government National Mortgage Association, then the Government National Mortgage Association, its successors and assigns, shall be named on the applicable loss payable draft as their interest may appear.

(2)    Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to: (i) give Government National Mortgage Association any rights under this Policy, (ii) include Government National Mortgage Association as an **Insured** under this Policy, or (iii) afford Government National Mortgage Association any rights as a third-party beneficiary of this Policy.

(3)    Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall remain the **Underwriter's** aggregate limit for all amounts payable under this Policy.  In no event shall any failure to make payment as described in paragraph (1) above serve to increase such Limit of Liability.

(4)    If the **Underwriter** cancels or non-renews Coverage Section D, or if it reduces or restrictively modifies the coverage provided by Coverage Section D, the **Underwriter** will endeavor to give thirty (30) business days advance notice to Government National Mortgage Association of such action, but the failure to do so shall not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor shall the **Underwriter** be held liable in any way by the **Insured**, Government National Mortgage Association or any other party for failure to provide such notification.

(5)    If the **Insured** requests to reduce the coverage provided by Coverage Section D, the **Underwriter** will endeavor to notify Government National Mortgage Association of such request within ten (10) business days of receipt of such request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor shall the **Underwriter** be held liable in any way by the **Insured**, Government National Mortgage Association or any other party for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                        Attorney-in-Fact

ENDORSEMENT NUMBER:  19

**AMEND DEFINITION OF EMPLOYEE –**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that Definition (H) **Employee** of Coverage Section D. Financial Institution Bond is amended to include Independent Contractors acting as registered representatives associated with the **Insured**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

ENDORSEMENT NUMBER:  20

**LOSS PAYEE ENDORSEMENT – CAPITAL ONE**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial Institution Bond:

(1)     Upon written request to the **Underwriter** by the corporate insurance/risk management director of the **Insured**, any payment in satisfaction of loss covered by Coverage Section D involving **Money** or other **Property** in which Capital One Services, Inc. ("Capital One") has an interest shall be made by an instrument issued (as to their respective interests) to the **Insured** and Capital One as joint loss payees.

(2)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to: (i) give Capital One any rights under this Policy, (ii) include Capital One as an **Insured** under this Policy, or (iii) afford Capital One any rights as a third-party beneficiary of this Policy.

(3)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall remain the **Underwriter's** aggregate limit for all amounts payable under this Policy. In no event shall any failure to make payment as described in paragraph (1) above serve to increase such Limit of Liability.

(4)     If the **Underwriter** cancels or non-renews Coverage Section D, or if it reduces or restrictively modifies the coverage provided by Coverage Section D, the **Underwriter** will endeavor to give thirty (30) business days advance notice to Capital One of such action, but the failure to do so shall not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor shall the **Underwriter** be held liable in any way by the **Insured**, Capital One or any other party for failure to provide such notification.

(5)     If the **Insured** requests to reduce the coverage provided by Coverage Section D, the **Underwriter** will endeavor to notify Capital One of such request within ten (10) business days of receipt of such request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor shall the **Underwriter** be held liable in any way by the **Insured**, Capital One or any other party for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
            Attorney-in-Fact

ENDORSEMENT NUMBER: 21

## LOSS PAYEE ENDORSEMENT – FIRST NATIONAL
## (COVERAGE SECTION D)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial Institution Bond:

(1)     Upon written request to the **Underwriter** by the corporate insurance/risk management director of the **Insured**, any payment in satisfaction of loss covered by Coverage Section D involving **Money** or other **Property** in which First National Financial, LP (Attention: Servicing Director, 100 University Avenue, North Tower, Suite 700, Toronto, Ontario M5J 1V6, Canada) ("First National") has an interest shall be made by an instrument issued (as to their respective interests) to the **Insured** and First National as joint loss payees.

(2)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to: (i) give First National any rights under this Policy, (ii) include First National as an **Insured** under this Policy, or (iii) afford First National any rights as a third-party beneficiary of this Policy.

(3)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall remain the **Underwriter's** aggregate limit for all amounts payable under this Policy. In no event shall any failure to make payment as described in paragraph (1) above serve to increase such Limit of Liability.

(4)     If the **Underwriter** cancels or non-renews Coverage Section D, or if it reduces or restrictively modifies the coverage provided by Coverage Section D, the **Underwriter** will endeavor to give thirty (30) business days advance notice to First National of such action, but the failure to do so shall not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor shall the **Underwriter** be held liable in any way by the **Insured**, First National or any other party for failure to provide such notification.

(5)     If the **Insured** requests to reduce the coverage provided by Coverage Section D, the **Underwriter** will endeavor to notify First National of such request within ten (10) business days of receipt of such request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor shall the **Underwriter** be held liable in any way by the **Insured**, First National or any other party for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 22

**LOSS PAYEE ENDORSEMENT – INDYMAC**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial
Institution Bond:

(1)     Upon written request to the **Underwriter** by the corporate insurance/risk management director of
the **Insured**, any payment in satisfaction of loss covered by Coverage Section D involving **Money**
or other **Property** in which IndyMac Commercial Lending Corporation (Attention: Servicing
Manager, 3 Banting, Irvine, CA 92618) ("IndyMac") has an interest shall be made by an
instrument issued (as to their respective interests) to the **Insured** and IndyMac as joint loss
payees.

(2)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to:
(i) give IndyMac any rights under this Policy, (ii) include IndyMac as an **Insured** under this
Policy, or (iii) afford IndyMac any rights as a third-party beneficiary of this Policy.

(3)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to
increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall
remain the **Underwriter's** aggregate limit for all amounts payable under this Policy.  In no event
shall any failure to make payment as described in paragraph (1) above serve to increase such Limit
of Liability.

(4)     If the **Underwriter** cancels or non-renews Coverage Section D, or if it reduces or restrictively
modifies the coverage provided by Coverage Section D, the **Underwriter** will endeavor to give
thirty (30) business days advance notice to IndyMac of such action, but the failure to do so shall
not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification,
nor shall the **Underwriter** be held liable in any way by the **Insured**, IndyMac or any other party
for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

8300-1020                            Page 1 of 1
Ed. 04/09

ENDORSEMENT NUMBER:  23

**LOSS PAYEE ENDORSEMENT – PAAC**
**(COVERAGE SECTION D)**

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to
The PNC Financial Services Group Inc. by Houston Casualty Company.


In consideration of the premium charged, it is agreed that, for purposes of Coverage Section D. Financial
Institution Bond:

(1)     Upon written request to the **Underwriter** by the corporate insurance/risk management director of
        the **Insured**, any payment in satisfaction of loss covered by Coverage Section D involving **Money**
        or other **Property** in which the Port Authority of Allegheny County (245 Sixth Avenue, 3rd Floor,
        Pittsburgh, PA 15222) ("PAAC") has an interest shall be made by an instrument issued (as to their
        respective interests) to the **Insured** and PAAC as joint loss payees.

(2)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to:
        (i) give PAAC any rights under this Policy, (ii) include PAAC as an **Insured** under this Policy, or
        (iii) afford PAAC any rights as a third-party beneficiary of this Policy.

(3)     Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to
        increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall
        remain the **Underwriter's** aggregate limit for all amounts payable under this Policy.  In no event
        shall any failure to make payment as described in paragraph (1) above serve to increase such Limit
        of Liability.

(4)     If the **Underwriter** cancels or non-renews Coverage Section D, or if it reduces or restrictively
        modifies the coverage provided by Coverage Section D, the **Underwriter** will endeavor to give
        thirty (30) business days advance notice to PAAC of such action, but the failure to do so shall not
        impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor
        shall the **Underwriter** be held liable in any way by the **Insured**, PAAC or any other party for
        failure to provide such notification.

(5)     If the **Insured** requests to reduce the coverage provided by Coverage Section D, the **Underwriter**
        will endeavor to notify PAAC of such request within ten (10) business days of receipt of such
        request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor
        shall the **Underwriter** be held liable in any way by the **Insured**, PAAC or any other party for
        failure to provide such notification.



All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective
with the Policy.

        Effective date of this endorsement:


                        By:_____
                                Attorney-in-Fact


8300-1021                         Page 1 of 1
Ed. 04/09

ENDORSEMENT NUMBER: 24

## LOSS PAYEE ENDORSEMENT – GOVERNMENT NATIONAL MORTGAGE ASSOCIATION (COVERAGE SECTION B)

To be attached to and made a part of Policy No. 24-MG-08-A9495, issued to The PNC Financial Services Group Inc. by Houston Casualty Company.

In consideration of the premium charged, it is agreed that, for purposes of Coverage Section B. Financial Institution Professional Liability:

(1)    If a **Claim** against the **Insured** also includes a **Claim** against the Government National Mortgage Association solely by reason of Government National Mortgage Association's ownership interest in property or assets which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured**, all **Loss** which Government National Mortgage Association becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Insured** becomes legally obligated to pay as a result of such **Claim**. All limitations, conditions, provisions and other terms of coverage applicable to the **Insured** shall also be applicable to Government National Mortgage Association. This coverage extension shall not apply to the extent the **Claim** alleges any act, error or omission by Government National Mortgage Association. In the event of a loss affecting the interest of the Government National Mortgage Association, then the Government National Mortgage Association, its successors and assigns, shall be named on the applicable loss payable draft as their interest may appear.

(2)    Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to: (i) give Government National Mortgage Association any rights under this Policy, (ii) include Government National Mortgage Association as an **Insured** under this Policy, or (iii) afford Government National Mortgage Association any rights as a third-party beneficiary of this Policy.

(3)    Nothing in the extension set forth in paragraph (1) above is intended, nor shall it be construed, to increase the Limit of Liability set forth in Item C of the Declarations, which in all events shall remain the **Underwriter's** aggregate limit for all amounts payable under this Policy. In no event shall any failure to make payment as described in paragraph (1) above serve to increase such Limit of Liability.

(4)    If the **Underwriter** cancels or non-renews Coverage Section B, or if it reduces or restrictively modifies the coverage provided by Coverage Section B, the **Underwriter** will endeavor to give thirty (30) business days advance notice to Government National Mortgage Association of such action, but the failure to do so shall not impair or delay the effectiveness of such cancellation, non-renewal, reduction or modification, nor shall the **Underwriter** be held liable in any way by the **Insured**, Government National Mortgage Association or any other party for failure to provide such notification.

(5)    If the **Insured** requests to reduce the coverage provided by Coverage Section B, the **Underwriter** will endeavor to notify Government National Mortgage Association of such request within ten (10) business days of receipt of such request, but the failure to do so shall not impair or delay the effectiveness of such reduction, nor shall the **Underwriter** be held liable in any way by the **Insured**, Government National Mortgage Association or any other party for failure to provide such notification.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

    Effective date of this endorsement:

                By:_____
                              Attorney-in-Fact